486 So.2d 642 (1986)
REEDY CREEK IMPROVEMENT DISTRICT, Appellant,
v.
State of Florida Department of Environmental Regulation and Central Florida Utilities, Inc., Appellees.
No. BG-279.
District Court of Appeal of Florida, First District.
April 4, 1986.
*643 Philip S. Parsons and Joseph W. Landers, Jr. of Landers, Parsons and Uhlfelder, Tallahassee, for appellant.
B.J. Owens and Deborah A. Getzoff, Asst. Gen. Counsel, State Dept. of Environmental Regulation, Tallahassee, for appellees.
Kathryn G.W. Cowdery and B. Kenneth Gatlin of Gatlin, Woods, Carlson and Girtman, Tallahassee, for appellee/cross appellant.
JOANOS, Judge.
This is an appeal and cross appeal from a final order entered by the Department of Environmental Regulation (DER) awarding a construction permit to Central Florida Utilities, Inc. (CFU). Reedy Creek Improvement District (RCID) presents two issues for our review: (1) whether equitable estoppel should apply to require or justify issuance of a permit to CFU, and (2) whether DER erred in rejecting conclusion of law number six relating to compliance with water quality standards and permitting requirements. The issue raised by CFU on cross appeal is whether RCID's appeal must be dismissed for lack of subject matter jurisdiction. We affirm.
The issues presented here had their inception with an enforcement action initiated by DER against Service Facilities, Inc. (subsequently purchased by CFU). In an order dated April 21, 1981, the Circuit Court of Osceola County found that the utility's Camelot Manor South sewage treatment plant had caused pollution by discharging effluent into the surface waters of Shingle Creek/Lake Tohopeliga Basin in violation of Section 403.161, Florida Statutes, a prior consent order and DER permit. CFU was directed to submit a complete application including designs, plans and schedule of implementation for an alternative system of effluent disposal. In the same order, DER was directed to expedite the application. In addition, the Circuit Court order required CFU to complete construction within fifteen months, *644 and expressly barred CFU from discharging any effluent into the Shingle Creek Basin after that fifteen month period.
In July 1982 CFU petitioned DER for dissolved oxygen (DO) alternative criteria and allowance of a mixing zone, if appropriate. With the petition was a report prepared by Dr. Crisman of the University of Florida Department of Environmental Engineering Sciences. This report indicated that Bonnett Creek, the waterway designated on CFU's application to receive the discharge from its new facility, was a waterway of extremely poor water quality. In Dr. Crisman's opinion, sewage discharge into Bonnett Creek, especially above the control structure, would have little detrimental impact on the stream system. Dr. Crisman emphasized, however, that his judgment was based solely on limited field data collected in a limited time frame.
On August 2, 1982, CFU applied to DER for a construction permit authorizing CFU to modify its Camelot Manor sewage treatment facility from 0.5 million gallons per day (MGD) capacity to a 1.5 MGD advanced water treatment (AWT) facility, which would discharge effluent into a manmade box cut canal portion of Bonnett Creek. DER issued notice of proposed agency action on September 23, 1982, and published notice of its proposed agency action in a local newspaper on September 29, 1982. No timely objections were filed, and on October 15, 1982, DER issued the requested permit to CFU. Pursuant to DER's approval of and agreement with RCID as a local pollution control program, a copy of the permit was sent to RCID as well as to CFU.[1]
On November 3, 1982, RCID filed a petition for a formal administrative hearing to contest the issuance of the permit and a motion to stay the effect of the permit. CFU filed a motion to dismiss RCID's petition as untimely and a response to RCID's request for a stay. DER denied the motion for a stay, and transferred RCID's petition to the Department of Administrative Hearings (DOAH). After a hearing on the motion to dismiss, DER adopted the DOAH recommended order and dismissed the petition. RCID then filed notice of appeal with this court RCID took the position that since DER failed to provide it with a copy of CFU's application and afford it the opportunity to make written comments thereon, the proceeding should be started anew, thus allowing RCID to participate in proposed agency action pursuant to its agreement. This court agreed, and remanded the proceeding to DER with directions to furnish RCID a copy of the application, to allow RCID to participate in the permitting process by offering comments on the application and, if RCID had concerns about the proposed agency action, to contest the agency action in a formal evidentiary hearing. Reedy Creek Improvement District v. DER, 447 So.2d 313 (Fla. 1st DCA 1984).
DER, in compliance with the court's mandate, afforded RCID an opportunity to submit written comments regarding CFU's application for a permit. In those written comments, RCID concluded that 
The great weight of data, analysis and modeling show that water quality standards cannot be achieved following the proposed discharge by CFU. A site specific alternative criteria has not been justified, and even if granted, the applicant's own analysis shows it will not be achieved. For these reasons, Reedy Creek Improvement District opposes any action by the Department which will allow discharge into Bonnett Creek from the facilities proposed by CFU.
On March 28, 1984, DER noticed its intent to issue a permit to CFU which contained provisions and conditions nearly identical to those contained in the 1982 permit. On April 10, 1984, RCID petitioned for a formal administrative hearing pursuant to Section 120.57, Florida Statutes.
*645 On July 20, 1984, shortly before the scheduled hearing, DER issued a notice of modification proposing to amend specific conditions 4 and 5 of the original permit and to add new specific conditions 9, 10, and 11  imposing more stringent effluent limitations and establishing lower discharge flows while the construction permit remained in effect.
The final hearing was held on July 24-26, 1984, and August 13, 14, 22 and 28, 1984. Evidence adduced at the hearing established that CFU entered into contracts obligating the Camelot Manor Plant to provide additional service and that it obtained $3 million in industrial development bonds to finance its advanced wastewater treatment plant. CFU's vice-president acknowledged that the bond obligations and service obligations were incurred after and with full knowledge that RCID had appealed DER's final order issuing the construction permit. He explained that the company was under a circuit court order to build a treatment facility within a specified time period, and the state had granted the permit initially. While the company realized there was some risk attendant upon moving forward with financing and construction, the feeling among company officials was that the company had to comply with the judicial order.
The field testing performed in this case was abbreviated due to DER's response to the circuit court order to consider CFU's application on an expedited basis. After hearing testimony from various experts, including DER personnel, the hearing officer concluded the methodology employed by DER was flawed, partly because it tended to bias the results in favor of lower dissolved oxygen values in the stream, which values were based on inadequate data and assumed dissolved oxygen readings at depth intervals which were not actually measured. In its proposed order, DER conceded that certain deficiencies in the testing and analysis were present, but considered that sufficient data had been compiled to insure that CFU can operate temporarily without endangering the environment. DER took the position that during the interim testing period, CFU would conduct extensive testing and evaluation, and the effluent limitations would be modified if necessary when an operating permit was sought by CFU.
The hearing officer found only partial compliance with statutory and rule requirements, and recommended denial of CFU's application for a construction permit. DER's final order adopted the hearing officer's findings of fact and conclusions of law, with certain exceptions. First, DER rejected the hearing officer's conclusion of law that the special circumstances permitting equitable estoppel are not present in this case. In making this determination, the Secretary stated:
I have carefully considered the potential impacts on the environment, and particularly on the water quality of Bonnett Creek and downstream bodies of water. CFU has now completed construction of the AWT plant. Thus the only effect of issuing a construction permit at this time would be to allow CFU to operate for a limited period of time to test the plant. Before CFU can actually begin full scale operation, it must obtain an operation permit from the Department. In conjunction with processing the application for an operation permit, the Department may impose more stringent effluent limitations and require any changes in the design of the plant necessary to meet those limits and assure compliance with applicable water quality standards.
.....
I further find that it is within the Department's discretion to consider the water quality benefits which will accrue to Shingle Creek as a result of redirecting the Camelot Manor discharge from Shingle Creek to Bonnett Creek. The Department must operate in the real world and must sometimes choose an option, due to exceptional circumstances, which, while perhaps not the most desirable solution for the long term, affords reasonable solution for a limited period of time.
*646 Next, DER rejected the hearing officer's conclusion that the proposed effluent limitations are deficient and that CFU failed to provide reasonable assurances that the designated uses of the stream and biological integrity would not be impaired as a result of additional nutrient loading. In this regard, the Secretary relied in part on a new waste load allocation (WLA), issued subsequent to the hearing, which addresses the effluent limitations to be imposed on CFU, and on Department practice of imposing monitoring requirements in construction permits to ensure that nutrient concentrations do not cause an imbalance in populations of aquatic flora and fauna. On this point, the Secretary stated:
[T]he Department's WLA for the Reedy Creek basin has now been completed. That WLA will serve as the basis for any permitting decision if CFU applies for an operation permit for a discharge to Bonnett Creek.
In light of this new development and the hearing officer's findings of fact, I conclude that reasonable assurances have been provided for purposes of the construction permit with respect to appropriate effluent limitations and nutrient impacts. (emphasis in original).
In its final order, DER directed that CFU should be issued a construction permit in substantially the same form contained in the draft permit which accompanied the Notice of Intent to Issue dated March 28, 1984, with the modifications listed in the Amended Notice of Modification of Specific Conditions of Draft Permit issued in July 1984, and with further modifications in compliance dates to reflect the elapse of time since the amended notice of modification was issued.
In oral arguments before this court, counsel for DER reiterated the Department's position that the operating permit was for the limited purpose of testing the effluent and evaluating the results. DER took the position that it has authority, when considering an application for an operating permit, to require the applicant to modify the plant design and to change the effluent limitations established in the construction permit. Counsel for RCID maintained that RCID's concern was due to DER's past practice and policy, which they argued has been to establish the SSAC, and once established that SSAC remained in effect with respect to both construction and operating permits.
The first issue is whether equitable estoppel should apply against DER to require issuance of a construction permit to CFU. The elements of an equitable estoppel are:
(1) a property owner's good faith reliance on
(2) some act or omission of the government and
(3) a substantial change in position or the incurring of excessive obligations and expenses so that it would be highly inequitable and unjust to destroy the right acquired.
Franklin County v. Leisure Properties, Ltd., 430 So.2d 475, 479 (Fla. 1st DCA 1983). Accord: Hollywood Beach Hotel Co. v. City of Hollywood, 329 So.2d 10 (Fla. 1976); North American Company v. Green, 120 So.2d 603 (Fla. 1959); Special Disability Trust Fund v. Master Distributors, 418 So.2d 1124 (Fla. 1st DCA 1982).
The existence of certain conditions or events in a given case will preclude a claim of good faith reliance. For example, knowledge of pending litigation directly attacking the validity of a permit will serve as a warning or "red flag" to one seeking to establish estoppel. Sakolsky v. City of Coral Gables, 151 So.2d 433, 436 (Fla. 1963). Still, the fact that one relies to his detriment upon preliminary, as opposed to final, approval of a project requiring significant expenditures will not act as a bar to the application of estoppel. The Florida Companies v. Orange County, Florida, 411 So.2d 1008, 1011 (Fla. 5th DCA 1982). In other words, so long as the affected party has no reason to believe "the official mind would change," the doctrine of equitable estoppel may be invoked, even though an appeal is pending. Andover Development Corporation v. City of New *647 Smyrna Beach, 328 So.2d 231, 238 (Fla. 1st DCA 1976); City of Gainesville v. Bishop, 174 So.2d 100 (Fla. 1st DCA 1965).
Equitable estoppel will apply against a state agency, however, only upon a showing of exceptional circumstances. North American Co. v. Green, 120 So.2d at 610. And, it is fundamental that the doctrine of estoppel will not apply to "transactions that are forbidden by statute or that are contrary to public policy." Montsdoca v. Highlands Bank & Trust Co., 85 Fla. 158, 163, 95 So. 666, 668 (1923); Dade County v. Gayer, 388 So.2d 1292, 1294 (Fla. 3rd DCA 1980). See also: Godson v. Town of Surfside, 150 Fla. 614, 8 So.2d 497 (Fla. 1942).
In this case, the record is clear that CFU went forward with and incurred financing obligations, additional service obligations, and construction of the AWT facility with full knowledge that RCID had appealed the agency's final order which authorized issuance of the construction permit. On these facts, the hearing officer found it unreasonable for CFU to rely on the agency representation, and considered the special circumstances which would permit equitable estoppel were not present in this case.
DER disagreed, finding exceptional circumstances in this case that would make it inequitable to deny CFU a construction permit. First, CFU was under a circuit court order to cease discharging from its Camelot Manor sewage treatment plant to Shingle Creek. CFU explored several alternatives, and then applied to DER for a construction permit to upgrade its facility and for a permit to discharge to Bonnett Creek.
Second, the record reflects CFU's belief that DER approved its proposed alternative to take its discharge out of Shingle Creek. This belief is credible in light of the fact that in November 1982 DER denied RCID's motion to stay the effect of the permit, and after an administrative hearing on RCID's petition for a hearing to challenge the issuance of the permit  DER dismissed the petition. Although RCID appealed the dismissal of its petition to this court, Section 120.68(3), Florida Statutes expressly provides that filing a petition for review in a district court of appeal does not in itself stay enforcement of an agency decision. In addition, RCID did not seek a review of DER's earlier denial of a stay.
Third, acting on reliance on its permit, CFU substantially completed construction of its AWT plant, obligated itself to repay $3 million in industrial bonds, and entered into additional service contracts. In distinguishing this case from Austin v. Austin, 350 So.2d 102 (Fla. 1st DCA 1977), the Secretary noted that this court overturned DER's final order on procedural grounds rather than on the ground that the Department had made a mistake of law. Finally, in determining that estoppel was indicated in this case, the Secretary noted the construction permit discharge provisions were limited to the time period required to test the plant. With regard to future limitations, the Secretary stated:
Before CFU can actually begin full scale operation, it must obtain an operation permit from the Department. In conjunction with processing the application for an operation permit, the Department may impose more stringent effluent limitations and require any changes in the design of the plan necessary to meet those limits and assure compliance with applicable water quality standards.

.....

I specifically limit this ruling to the facts of this case. I do not intend to suggest by this order that any person, who receives a permit from the Department where an appeal is taken without a stay being granted, may act in accordance with the permit and then retreat behind the doctrine of equitable estoppel where no exceptional circumstances exist. (emphasis supplied).
We agree with the Secretary's reasoning and hold that in the narrow circumstances of this case, estoppel will apply against DER to require issuance of a construction *648 permit to CFU. This determination is made in recognition of DER's continuing authority to require another SSAC in connection with issuance of an operating permit, if such proves necessary to assure compliance with applicable water standards.
RCID's second challenge is directed to DER's determination that CFU had provided "reasonable assurances" as required by Florida Administrative Code Rule 17-4.07(1) that the effluent discharge from the AWT facility would not impair the water quality of Bonnett Creek or its current designated use. We note at the outset that an agency's interpretation of its own rules or operable statutes is entitled to great deference. In Public Employees Relations Commission v. Dade County Police Benevolent Association, 467 So.2d 987, 989 (Fla. 1985), the supreme court said "a reviewing court must defer to an agency's interpretation of an operable statute as long as that interpretation is consistent with legislative intent and is supported by substantial, competent evidence." As CFU noted in its brief, this case is replete with conflicting evidence concerning the validity of the testing and the methodology used to establish the SSAC and the mixing zone. In keeping with the rule that an agency may not reverse findings of fact which are supported by competent substantial evidence, a reviewing court may not substitute its judgment for that of the agency on disputed findings of fact. s.120.68(10), Fla. Stat.; Clark v. Department of Professional Regulation, 463 So.2d 328, 330 (Fla. 5th DCA 1985). We find the Secretary's determination that "reasonable assurances" had been given with regard to maintenance of water quality standards is a matter reserved to agency expertise and interpretation. PERC v. Dade County Police Benevolent Association, supra. We consider the Secretary's final order correctly took into account the different considerations and parameters involved in a construction permit issued pursuant to Florida Administrative Code Rule 17-4.21[2] and an operation permit issued pursuant to Florida Administrative Code Rule 17-4.24.[3] In addition, *649 we find the Secretary's consideration of the newly issued waste load allocation (WLA) covering Bonnett Creek was proper in light of the Department's continuing obligation to consider all current circumstances which would have an impact on the issuance of the permit. See: McDonald v. Department of Banking and Finance, 346 So.2d 569, 584 (Fla. 1st DCA 1977).
Finally, we reject CFU's contention, on cross appeal, that neither DER nor this court has subject matter jurisdiction to entertain this appeal. The hearing officer found that RCID constructed, owns, and maintains the canal into which CFU's effluent will flow. It is clear, therefore, that RCID has an interest in water quality in Bonnett Creek, and that this interest is the type of interest which Chapter 403 was designed to protect. As such, RCID has standing because it has demonstrated (1) that it will suffer injury in fact of sufficient immediacy to entitle it to a 120.57 hearing, and (2) that its substantial injury is of a type or nature which the proceeding is designed to protect. Agrico Chemical Company v. Department of Environmental Regulation, 406 So.2d 478, 482 (Fla. 2d DCA 1981). See also: Florida Medical Association, Inc. v. Department of Professional Regulation, 426 So.2d 1112 (Fla. 1st DCA 1983).
Accordingly, the order appealed from is affirmed, with the express provision that DER may require a new SSAC and may impose more stringent limitations on CFU before issuance of an operating permit.
Affirmed.
SHIVERS and NIMMONS, JJ., concur.
NOTES
[1] Reedy Creek Improvement District was established by the legislature as a unit of local government in 1967. In September 1976 DER approved RCID as a local pollution control program pursuant to Section 403.182, Florida Statutes. RCID's agreement with DER entitled RCID to receive copies of each application which would affect RCID.
[2] FAC Rule 17-4.21 provides:

17-4.21 Construction Permits.
(1) In addition to requirements of Part I of this chapter, a Department Construction Permit shall be obtained in accordance with the following:
(a) A notice of intent by the owner(s) or his (their) authorized agent.
(b) A completed application form furnished by the Department.
(c) An engineering report covering plant description and operations, types and quantities of all waste material generated whether liquid, gaseous or solid, and proposed waste control facilities, the treatment objectives and the design criteria on which the control facilities are based, and other information deemed relevant. Design criteria shall be based on the results of laboratory and pilot-plant scale studies whenever such studies are warranted. The design efficiencies of the proposed waste treatment facilities and the quantities and types of pollutants in the treated effluents or emissions shall be indicated. Work of this nature shall be subject to the requirements of Chapter 471, F.S. Where confidential records are involved, the Secretary is authorized to limit full disclosure after personal discussion with the applicant.
(d) Owners' written guarantee to meet the design criteria as accepted by the Department and to abide by Chapter 403, F.S., and the rules and regulations of the Department as to the quantities and types of materials to be discharged from the plant. The owner may be required to post an appropriate bond to guarantee compliance with such conditions in instances where the owner's financial resources are inadequate or proposed control facilities are experimental in nature.
(2) The construction permit may contain an expiration date as determined by the Secretary.
(3) When the Department issues a permit to construct, the recipient of said permit shall be allowed a period of time, specified in the permit to construct, and for operating and testing to determine compliance with Chapter 403, F.S., and the rules and regulations of the Department. The Department may require such tests and evaluations of the treatment facilities to be accomplished by the applicant at his expense.
[3] FAC Rule 17-4.24 provides:

17-4.24 Operation Permits for Water Pollution Sources.
(1) Any person intending to discharge wastes into the waters of the State shall make application to the Department for a water pollution prevention operation permit. Application shall be made in accordance with Part I of Chapter 17-4, Florida Administrative Code, and shall include:
(a) The daily concentration and total daily weight of each contaminant contained in the discharge.
(b) The daily temperature of the discharge
(c) Any additional information reasonably necessary to evaluate the effect of such discharges upon the receiving waters.
(2) If the Department finds that the proposed discharge will reduce the quality of the receiving waters below the classification established for them or if the proposed discharge will violate any Department rule or standard, it shall deny the permit.
(3) A permit issued pursuant to this section shall:
(a) Specify the manner, nature, volume and frequency of the discharge permitted
(b) Require proper operation and maintenance of any pollution abatement facility by qualified personnel in accordance with standards established by the Department; and
(c) Contain such additional conditions, requirements and restrictions as the Department deems necessary to preserve and protect the quality of the receiving waters.
(4) An operation permit may be renewed upon application to the Department. No renewal permit shall be issued if the Department finds that the proposed discharge will reduce the quality of the receiving waters below the classification established for them.