WALLACE, Judge,
Dissenting.
I respectfully dissent. DOT’S predecessor, the State Road Department, did not have specific statutory authority to agree to the indemnity clause in the crossing agreement with the railroad.[7] For this reason, I conclude that the indemnity clause is void and unenforceable.
I. INTRODUCTION
The majority states that “[t]he only issues on appeal concern the enforceability of the crossing agreement.” (maj. op. at § III) I disagree. In my view, the issues on appeal concern the enforceability of the indemnity clause contained in the crossing agreement. The parties agree that DOT has the authority generally to enter into crossing agreements. We are not called upon to address the larger issue of the *218 enforceability of the crossing agreement as a whole.
The majority gives short shrift to DOT’S argument that the indemnity clause is void because it lacked the authority to enter into an agreement to indemnify the railroad. In the second section of this dissent, I will restate DOT’S argument on this issue. Next, I will discuss my disagreements with the majority’s analysis. Before concluding, I will outline a brief proposal for a legislative solution to the problem illustrated by the facts of this case.
II. DOT LACKED THE AUTHORITY TO AGREE TO INDEMNIFY THE RAILROAD
DOT is an agency of the state.[8] § 20.23, Fla. Stat. (2002). As a state agency, the DOT is a creature of statute and has only such powers as may be conferred on it by statute. See Fla. Elections Comm’n v. Davis, 44 So.3d 1211, 1215 (Fla. 1st DCA 2010) (quoting State ex rel. Greenberg v. State Bd. of Dentistry, 297 So.2d 628, 634 (Fla. 1st DCA 1974)). The long-established rule is that “[sjtate agencies may exercise only those powers which are expressly granted by statute or which are necessarily implied from such express powers.” Op. Att’y Gen. Fla. 78-20 (1978) (citing State v. Atl. Coast Line R.R., 56 Fla. 617, 47 So. 969, 978-79 (1908)).
Florida’s constitution and statutes impose strict limits on the expenditures of public funds by state agencies. In accordance with article VII, section 1(c) of the Florida Constitution, “[n]o money shall be drawn from the treasury except in pursuance of appropriation made by law.” A legislative enactment reinforces this constitutional command in no uncertain terms:
No agency or branch of state government shall contract to spend, or enter into any agreement to spend, any moneys in excess of the amount appropriated to such agency or branch unless specifically authorized by law, and any contract or agreement in violation of this chapter shall be null and void.
§ 216.311(1), Fla. Stat. (2002).
DOT currently has specific statutory authority to enter into many different kinds of contracts. See § 337.02, Fla. Stat. (2013) (contracts to purchase commodities such as materials, machinery, tools, equipment, and supplies); § 337.026(2) (contracts to purchase construction aggregate materials); § 337.03(1) (contracts to purchase surplus property from the federal government); § 337.107 (contracts for right-of-way services); § 337.1075 (contracts for transportation-related planning services); § 337.11(1) (contracts for road construction and maintenance); § 337.111 (contracts for the installation of monuments and memorials to military veterans at highway rest areas). However, the current statutes do not — and the statutes in effect in 1936 did not — authorize the DOT to enter into an indemnity agreement of the type at issue in this case.
Notably, section 337.108(2) provides that the DOT “may agree to hold harmless and indemnify a contractor for damages when the contractor discovers or encounters hazardous materials or pollutants during the performance of services for the department. ...” The legislature enacted section 337.108 in 1992. Ch. 92-152, § 125, at 1607-08, Laws of Fla. The DOT informs us that section 337.108 “is the only statute the DOT is aware of that authorizes the DOT to agree to indemnify or otherwise *219 bind the state in that regard.”[9] Undeniably, section 387.108(2) is not applicable to the indemnity clause under review.
The enactment of section 337.108 demonstrates that the legislature knows how to authorize DOT to agree to indemnify a contract party. Under the doctrine of in-clusio unius est exclusio alterius, the legislature’s authorization of an indemnity agreement in one very specific instance regarding hazardous materials and pollutants supports the conclusion that the DOT is prohibited from entering into indemnification agreements in all other instances. See Indus. Fire & Cas. Ins. Co. v. Kwechin, 447 So.2d 1337, 1339 (Fla. 1983); Miulli v. Fla. High Sch. Athletic Ass’n, Inc., 998 So.2d 1155, 1157 (Fla. 2d DCA2008); Davis, 44 So.3d at 1215.
Florida’s Attorney General has specifically addressed the question whether a state agency such as the DOT may agree to an indemnity clause contained in a contract to which it was otherwise authorized to enter. In 1978, Palm Beach County requested an opinion from the Attorney General on the following question: “Are there any legal constraints which would limit the power of a state agency to enter into an indemnification agreement?” Op. Att’y Gen. Fla. 78-20 (1978). The Attorney General’s response was unequivocal:
There being no express statutory power here, the state agencies acting as your county’s subgrantees are without authority to execute indemnification contracts of the type you have mentioned or to anywise bind the state in that regard. If any of these state agencies did enter into such an indemnification contract, any judgment in a suit thereupon would be of no legal force or effect, not merely because consent thereto has not been duly given nor sovereign immunity duly waived as to such a suit, but also because a claim against the state cannot be paid by a state agency unless a statute exists empowering it to pay such claims, and the Legislature has appropriated funds for such purpose, and the claim has been audited and approved as provided by law. Florida Development Commission v. Dickinson, 229 So.2d 6, 8 ([Fla. 1st DCA] 1969), cert, denied, 237 So.2d 530 (Fla.1970); AGO 071-28; accord Attorney General Opinions 077-12 and 076-46.
Id. The Attorney General concluded his opinion as follows:
[Constitutional and legal constraints limiting the power of a state agency to enter into an indemnification agreement imposing contractual liability upon the state do exist, and that, at least with regard to indemnification agreements of the type you have mentioned, these constraints render nugatory and unenforceable as against the state or its agencies any such agreement entered into by a state agency.

Id.

Under this reasoning, the absence of any specific statutory authorization for the indemnity clause in the crossing agreement compels the conclusion that the clause has “no legal force or effect” and is “nugatory and unenforceable” against the DOT. Id.; see also § 216.311(1); Am. Home Assur. Co. v. Nat’l R.R. Passenger Corp., 908 So.2d 459, 475 (Fla.2005) (“Florida’s Constitution expressly limits the state’s ability to expend funds and enter contracts by requiring specific statutory authority.”) “Although an opinion of the Attorney General is not binding on a court, it is entitled to careful consideration and generally should be regarded as highly *220 persuasive.” State v. Family Bank of Hallandale, 623 So.2d 474, 478 (Fla.1993) (citing Lowry v. Parole & Prob. Comm’n, 473 So.2d 1248,1249 (Fla.1985), and Beverly v. Div. of Beverage of Dep’t of Bus. Reg., 282 So.2d 657, 660 (Fla. 1st DCA 1973)).
CSX concedes that DOT must have specific statutory authority to enter into contracts. It argues that DOT had the necessary authority to enter into a crossing agreement such as the one at issue in this case. However, as DOT points out, it “must have specific authority to agree to indemnify another, and it makes no difference if the agreement stands alone or is part of a larger contract whose overall purpose is authorized.” An agency cannot evade the prohibition against incurring unauthorized obligations simply by including a prohibited agreement in another contract. It was just such a proposed arrangement which prompted Palm Beach County to make the inquiry that resulted in the issuance of Attorney General Opinion 78-20.
Finally, as the majority notes, the supreme court’s decision in the American Home case does not address the question that we are called upon to decide here. In the American Home case, the entity that had negotiated a comparable agreement containing an indemnity clause was a municipal agency. 908 So.2d at 463-64. The supreme court did not address the question of whether an indemnity agreement was enforceable against a state agency such as DOT. Id. at 473-74.
In closing, DOT reminds us that the state’s waiver of sovereign immunity for contractual obligations is limited “to suits on express, written contracts into which the state agency has the statutory authority to enter.” Pan-Am Tobacco Corp. v. Dep’t of Co'rr., 471 So.2d 4, 6 (Fla.1984). The indemnity clause at issue here does not qualify as such a contract because DOT lacked the statutory authority to enter into it.
III. CONSIDERATION OF THE MAJORITY’S ANALYSIS
The majority does not address the issue of DOT’s authority to enter into an agreement to indemnify CSX. Instead, the majority reframes the issue before us as one of equitable estoppel. I have several disagreements with the majority’s estoppel analysis.
First, the majority repeatedly states that the indemnity clause was “the sole consideration” for the crossing agreement. I think that this is incorrect. The agreement gave the DOT the right to locate a highway crossing over the railroad’s track at the designated location near Fivay. However, DOT also assumed the liability for the cost of the construction, repair, and maintenance of the crossing, plus the responsibility for safety measures such as “the cost of any watchman or gates.” By assuming the obligation to construct the crossing and to pay for its maintenance and continuing costs, DOT bound itself to do something that it was not otherwise obligated to do.[10] This was a sufficient consideration for the railroad’s promise. See Mangus v. Present, 135 So.2d 417, 418 (Fla.1961); Lake Sarasota, Inc. v. Pan Am. Sur. Co., 140 So.2d 139, 142 (Fla. 2d *221 DCA 1962); Fontainbleau Hotel Corp. v. Crossman, 323 F.2d 937, 942 (5th Cir.1963) (applying Florida law).
Second, the majority’s “parade of horri-bles” argument is both unsupported by the record and addresses issues not properly before us. The majority conjures a disquieting scenario of the dire consequences it suggests may occur if this court declines to affirm the trial court’s decision to enforce the indemnity clause contained in the crossing agreement. According to the majority, a reversal of the judgment might prompt CSX to cancel not only the crossing agreement under review but also its other crossing agreements with DOT. The result, the majority warns, may be the closing of many important roads around the state.
Based on my review of the record, I think that this court lacks sufficient information to predict the impact of a reversal of the final judgment in this case. DOT certainly has many capable lawyers. I think that it is fair to assume that some of these lawyers have carefully considered the state-wide implications of DOT’s decision to contest CSX’s claim for indemnity in this case. More importantly, the question of CSX’s right to treat the crossing agreement under review and others like it as void or to cancel such agreements is not before us. Accordingly, we ought not to address the question of what CSX could or could not do in the event of a decision holding the indemnity clause to be void and unenforceable. See Lightsee v. First Nat’l Bank of Melbourne, 132 So.2d 776, 778 (Fla. 2d DCA 1961) (“We are not authorized to pass upon issues other than those properly presented on appeal.”).
Third, the majority bases its theory for the affirmance of the judgment entirely on an estoppel against DOT, as if DOT were just an ordinary litigant. This approach ignores DOT’s status as a state agency. In order for the state or its agencies to be estopped, the circumstances must be exceptional. Greenhut Constr. Co., Inc. v. Henry A. Knott, Inc., 247 So.2d 517, 524 (Fla. 1st DCA 1971). In addition, the circumstances “must include some positive act on the part of some officer of the state upon which the aggrieved party had a right to rely and did rely to its detriment.” Id. The state may not be estopped by the unauthorized acts or representations of its officers. Id. “[I]t is fundamental that the doctrine of estoppel will not apply to ‘transactions that are forbidden by statute or that are contrary to public policy.’ ” Reedy Creek Improv. Dist. v. State Dep’t of Envtl. Reg., 486 So.2d 642, 647 (Fla. 1st DCA 1986) (quoting Montsdoca v. Highlands Bank & Trust Co., 85 Fla. 158, 95 So. 666, 668 (1923)).
Here, the indemnity clause is not authorized by statute and is contrary to public policy. The person who executed the crossing agreement on behalf of DOT acted without authority in agreeing to the inclusion of the indemnity clause in the agreement. CSX either knew or should have known that the indemnity clause was unauthorized. Under these circumstances, there can be no estoppel against DOT with regard to the indemnity clause. See Reedy Creek, 486 So.2d at 647; Greenhut Constr., 247 So.2d at 524.
Finally, the majority suggests that the $502,462.22 judgment against DOT should be viewed as a deferred payment for a license “that apparently was free of charge for its first sixty-five years.” (maj. op. at § III) Disregarding the effects of inflation and the time-value of money, the majority’s deferred payment theory equates to an annual payment of approximately $7800 by DOT to CSX for the crossing agreement. There is no information in our record concerning the market value of DOT’s license to cross CSX’s railroad tracks. *222 However, in light of DOT’s other obligations for the cost of construction, repair, and maintenance of the grade crossing, $7800 seems to me like a substantial annual payment.
There is a much more serious difficulty with the majority’s effort to support the affirmance of the final judgment with its deferred-payment theory. The problem is that the deferred-payment approach does not take into account the unlimited nature of DOT’s exposure under the indemnity clause. A single $500,000 payment every sixty-five years might be manageable. But another claim might be made next year and the year after that. The claim in this case resulted from an accident involving a fatality. The next claim or claims could easily total five, ten, or fifteen million dollars. If DOT has an unlimited exposure under indemnity clauses similar to the one under review in multiple crossing agreements around the state, the decision to declare such indemnity clauses enforceable could pose a significant challenge to DOT’s budget.
IV. A POSSIBLE LEGISLATIVE APPROACH
The courts are ill-equipped to solve the real problems posed by old crossing agreements containing indemnity clauses such as the one under review in this case. We have only two options; we can declare the indemnity clauses unenforceable, or we can enforce them. As the majority opinion and this dissent suggest, either approach poses difficulties.
A legislative solution to the problem we face may be in order. One possible approach would be legislation validating indemnity clauses in old crossing agreements executed by DOT such as the agreement in this case. In conjunction with such retroactive authorization, DOT’s liability under the indemnity clauses could be limited in amount as in section 768.28(5), Fla. Stat. (2013). Such an approach might minimize the possibility that CSX and other railroads would attempt to cancel or to rescind the crossing agreements, while limiting DOT’s potential liability under such indemnity clauses.[11]
V. CONCLUSION
Because the indemnity clause in the crossing agreement is void and unenforceable, I would reverse the final judgment in favor of CSX and remand for the entry of a final judgment in favor of DOT. I agree with the majority that we should certify the questions raised by this case to the supreme court as questions of great public importance. I would rephrase the questions as follows:
IS DOT BOUND BY AN INDEMNITY CLAUSE FOR WHICH IT HAD NO SPECIFIC STATUTORY AUTHORITY WHEN THE INDEMNITY CLAUSE IS CONTAINED IN A RAILROAD CROSSING AGREEMENT UNDER WHICH IT RECEIVED A REVOCABLE LICENSE TO USE LAND AS RIGHT-OF-WAY IN EXCHANGE FOR THE INDEMNITY CLAUSE AND OTHER CONSIDERATIONS?
IF SO, IS DOT’S LIABILITY UNDER THE INDEMNITY CLAUSE LIMITED BY SECTION 768.28(5), FLORIDA STATUTES (2002)?

. In this dissent, I will refer to both the State Road Department and its successor agency, the Department of Transportation, as “DOT.” I will refer to CSX Transportation, Inc., and its predecessors in interest as "CSX” or "the railroad.”

. The material in this section of my dissent consists largely of a condensed version of the argument made by DOT in point one of its initial brief.

. CSX does not dispute DOT's representation that section 337.108 is the only statute that authorizes the DOT to enter into a contract for an indemnity.

. Absent the crossing agreement, CSX would be obligated to maintain the crossing under current law. Section 335.141 (2)(c), Florida Statutes (2013), provides, in pertinent part, as follows: "Any public railroad crossing opened prior to July 1, 1972, shall be maintained by the railroad company at its own expense, unless the maintenance has been provided for in another manner by contractual agreement entered into prior to October 1, 1982.”

. A discussion of the constitutionality of such legislation is beyond the scope of this dissent.