908 So.2d 459 (2005)
AMERICAN HOME ASSURANCE COMPANY, et al., Appellants/Cross-Appellees,
v.
NATIONAL RAILROAD PASSENGER CORPORATION, etc., et al., Appellees/Cross-Appellants.
No. SC02-709.
Supreme Court of Florida.
July 7, 2005.
*462 Michael R. Karcher of Underwood, Karcher and Karcher, P.A., Miami, FL, for Appellant.
Michael J. Roper and Ernest H. Kohlmyer, III of Bell, Leeper and Roper, P.A., Orlando, FL and Alton G. Pitts, Orlando, FL, for Appellants/Cross-Appellees.
William G. Ballaine of Landman, Corsi, Ballaine, and Ford, P.C., New York, NY, for Appellees/Cross-Appellants.
Christopher Michael Kise, Solicitor General, Louis F. Hubener, and Matthew J. Conigliaro, Deputy Solicitor Generals, Tallahassee, FL, on behalf of Charles J. Crist, Jr., Attorney General, and the State of Florida, as Amicus Curiae.
PER CURIAM.
We have for review a question of Florida law certified by the United States Court of Appeals for the Eleventh Circuit that is determinative of a cause pending in that court and for which there appears to be no controlling precedent. See Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc., 286 F.3d 1233, 1258, 1269 (11th Cir.2002). We have jurisdiction. See art. V, § 3(b)(6), Fla. Const.
This case involves a series of cases originating in the United States District Court for the Middle District of Florida. The cases involve an 82-ton combustion turbine engine which was damaged in a train collision after the hauler rig carrying the turbine became immobilized on a railroad crossing. The parties to the underlying cases included the passenger train company (National Railroad Passenger Corp., "Amtrak"), the railroad track company (CSX Transportation, Inc.), the owner of the hauler rig (Rountree Transport and Rigging, Inc.), a municipal utility authority (Kissimmee Utility Authority), a state municipal power agency (Florida Municipal Power Agency), the insurer (American Home Assurance Company, subrogee of Stewart & Stevenson Services, Inc.), and others. The parties appealed the district court's final judgments to the Eleventh Circuit Court of Appeals.
The Eleventh Circuit consolidated the various appeals and certified four questions of Florida law to this Court for resolution. The first question relates to the application of Florida's comparative fault statute to a vicariously liable party. It asks whether a vicariously liable party should have the negligence of the active tortfeasor apportioned to it under section 768.81, Florida Statutes (1997), such that recovery of its own damages is correspondingly reduced. We answer "yes" to this question.
The remaining three questions relate to sovereign immunity. The second question asks whether, given that the Kissimmee Utility Authority, a municipal agency, contractually agreed to indemnify a private party, the agreement is controlled by the restrictions on waiver of sovereign immunity found in section 768.28, Florida Statutes (1997). We answer "no" to this question. The third question asks whether the agreement is instead controlled by the rule for breach-of-contract actions enunciated in Pan-Am Tobacco Corp. v. Department. of Corrections, 471 So.2d 4 (Fla.1984). Because *463 this case involves a municipality, and even before Pan-Am Tobacco municipalities had both the authority to contract and liability for breaching them, we answer "no" to this question but hold that the Kissimmee Utility Authority is bound by its contractual agreement to indemnify private parties. Finally, the fourth certified question asks whether, if Pan-Am does apply, a municipal agency loses the protection of sovereign immunity only if it has specific authority to execute indemnification agreements, or whether it is sufficient that the agency more generally has statutory authority to contract with private parties. Our answer to the third question, explained in detail below, renders moot the fourth.
Before dealing with these legal questions, we find it helpful to explain the involved factual and procedural history of this case.

Factual Background
Kissimmee Utility Authority (KUA) is a municipal agency created by the City of Kissimmee to construct, operate, and manage the municipal electrical systems. As part of its duty, KUA was overseeing the construction of the Cane Island Power Plant, an electrical facility near Kissimmee. KUA contracted with Black & Veatch (B & V) as the project engineers. KUA also entered into a participation agreement with Florida Municipal Power Agency (FMPA), a joint-action agency organized under Florida law with authority to undertake and finance electric projects.[1] Under the participation agreement, FMPA acquired 50% ownership interest in the new plant and agreed to share the production costs of electricity with KUA. KUA also entered into a Private Road Grade Crossing Agreement (crossing agreement) with CSX Transportation (CSX), which permitted KUA to construct, use, and maintain a private road grade crossing over CSX's railroad tracks in order to ensure vehicular and pedestrian access to the plant. The crossing agreement required KUA to "defend, indemnify, protect, and save [CSX] harmless from and against" certain designated losses and casualties. The crossing agreement also required KUA to indemnify any company whose property was operated by CSX at the railroad crossing.
KUA contracted with General Electric (GE) for the purchase and delivery of customized power generation equipment, including a combustion turbine. The purchasing agreement included an indemnification provision whereby GE promised to defend and indemnify KUA, its agents, and B & V due to any negligent act or omission of GE in performing work under the contract. GE contracted with Stewart & Stevenson Services, Inc. (S & S) to purchase and customize the equipment for the plant. S & S contracted with transportation broker WOKO for the transport of the customized turbine equipment. WOKO in turn contracted with Rountree Transport and Rigging, Inc. (Rountree) to have the combustion turbine and its housing transported to the plant on November 30, 1993. This shipment only included one of forty-five boxes of the customized turbine equipment that was being transported to the plant.
Rountree transported the 82-ton combustion turbine by using a road tractor that pulled a hauler rig. The height of the hauler rig had to be adjusted to negotiate gradations in the terrain. Without removing *464 the rig from the railroad tracks, the hauler crew adjusted the height of the hauler rig at the railroad crossing licensed to KUA from CSX. While this adjustment was taking place, an Amtrak passenger train collided with the rig. The collision destroyed the rig, the turbine, and its enclosure. The Amtrak train was damaged and some of the train crew and passengers suffered personal injuries.

Procedural History
Multiple lawsuits were filed by the various parties and their insurers in federal district court. CSX and Amtrak brought suit against B & V, Rountree, and KUA, claiming that the crossing was improperly designed and constructed by B & V, that Rountree and KUA were negligent in the transport of the turbine, and that KUA was obligated to defend and indemnify them based on the crossing agreement. The passengers and crew on the Amtrak train at the time of the collision sued for personal injuries and property damage. American Home Assurance Company (AHA), as subrogee of S & S, brought suit against CSX, Amtrak, Rountree, B & V, KUA, and FMPA, after compensating its insured S & S for loss of the turbine and its enclosure. AHA claimed that the collective negligence of the defendants caused S & S to sustain the loss covered by the AHA insurance policy. In turn, KUA brought a third-party complaint against GE, arguing that the purchase agreement required GE to defend and indemnify KUA.
The cases were consolidated and the district court bifurcated the proceedings into a liability phase and a damages phase. CSX and Amtrak moved for summary judgment on the indemnification by KUA under the crossing agreement; the district court granted summary judgment in favor of CSX, but denied Amtrak's motion because of unresolved factual issues. After a three-week trial in 1996 on the liability issue, the jury rendered its verdict. The district court granted judgment as a matter of law to S & S and GE, holding them free of direct negligence for the collision. The jury absolved all but three parties of direct negligence, finding Rountree 59% at fault, CSX 33% at fault, and Amtrak 8% at fault. The district court also granted B & V's motion and ruled that transportation of a combustion turbine was inherently dangerous as a matter of law and thus WOKO, S & S, and GE were vicariously liable for Rountree's negligence. The district court denied B & V, KUA, and FMPA's motion for summary judgment against GE. The district court ruled that these parties' losses in successfully defending themselves in the turbine litigation were not within the scope of the indemnification provision of the purchasing agreement with GE. The district court also granted Amtrak's renewed motion for summary judgment, ruling that as a matter of law KUA was contractually obligated by the crossing agreement to defend and indemnify Amtrak. The district court further ruled that as a matter of law Rountree's liability to AHA was limited to $1 million.
By the time the damages trial commenced in December 1999, all parties in the consolidated cases had settled their claims with all other parties, except for AHA as subrogee of S & S. AHA attempted to prove the amount of damages incurred by S & S by using the formula that its personnel had used in adjusting the insurance claim.[2] The district court refused to admit the documentary and testimonial evidence in support of this valuation. *465 The district court looked at the value of the turbine before the collision ($4,646,640) and subtracted the amount for which the damaged turbine was sold as scrap ($130,000) to arrive at the damage amount of $4,546,640. The district court concluded that AHA, standing in the shoes of S & S, was only entitled to recover 41% of the proven damages, or $1,851,822.40, because Rountree was found 59% at fault and S & S was found vicariously liable for this negligence based on the inherent dangerousness of transporting the turbine. Because the district court had already held that Rountree's liability to AHA was limited to $1 million, it entered final judgment against CSX and Amtrak jointly and severally for the remaining $851,822.40. The district court also denied AHA's request for prejudgment interest on its damages award.
AHA appealed to the Eleventh Circuit, claiming that the district court erred in restricting the evidence introduced to prove damages, in concluding that the transport of the turbine was inherently dangerous as a matter of Florida law, in applying Florida comparative fault principles to limit AHA to recovering 41% of S & S's proven damages, and in refusing to grant prejudgment interest. S & S, GE, and Rountree sought review of the ruling that the activity was inherently dangerous. KUA, FMPA, and B & V appealed against GE on the issue of contractual indemnification, arguing that the indemnification provision was applicable because they had to defend themselves against claims resulting from the collision that arose out of GE's failure to safely transport the turbine. KUA and FMPA also cross-appealed against CSX and Amtrak, arguing that the indemnification provision in the crossing agreement is unenforceable based on Florida sovereign immunity law; special requirements for indemnification in construction contracts under Florida law, which had not been met; Florida law dealing with exculpatory contracts; and the fact that the negligent actions of CSX occurred at a separate location from the crossing. KUA and FMPA also argued that even if the provision was enforceable, Amtrak was not covered by it.
On appeal, the Eleventh Circuit affirmed the district court's exclusion of AHA's damages evidence, concluding that under Florida law the proper measure of damages for loss to chattels is the difference between the value of the damaged property before and after the casualty and that Florida law requires courts to ensure that the damages awarded do not unjustly enrich the injured party. Nat'l R.R. Passenger Corp., 286 F.3d at 1244-48. The Eleventh Circuit also affirmed the district court's ruling that the transport of the combustion turbine was inherently dangerous, based upon the unique dimensions and weight of the turbine and transport vehicle, the Florida statutes that strictly regulate the transportation of oversized items, and the special precautions and preparations taken in transporting this turbine. Id. at 1248-50. The Eleventh Circuit also agreed with the district court's conclusion that Rountree's negligence in failing to transport the hauler rig from the railroad crossing was a function of the unique dangers that arose in transporting this oversized machinery and not due to Rountree's collateral negligence. Id. at 1250-53. The Eleventh Circuit further concluded that, as the principal, S & S could be held vicariously liable for Rountree's negligence, based on Rountree's status as the subcontractor to transportation contractor WOKO. Id. at 1253-54.

Comparative Fault Issue
AHA argued on appeal that its damages recovery should not be limited to 41% under the comparative fault principles *466 enunciated in section 768.81, Florida Statutes (1997). Nat'l R.R. Passenger Corp., 286 F.3d at 1254-56. AHA argued that a party who is only vicariously liable cannot have another's fault apportioned to him under section 768.81, as this statute only applies to parties who are directly negligent, who actively participate in the accident at issue, or who constitute joint or concurrent tortfeasors. AHA relied upon the use of the word "fault" in the statute. In response, KUA, FMPA, CSX, and Amtrak (the "comparative fault appellees") noted that under section 768.81(2) any contributory fault that is "chargeable to the claimant" has the effect of diminishing damages "for an injury attributable to the claimant's contributory fault." Id. at 1256. After examining the parties' arguments and reviewing Florida case law, the Eleventh Circuit concluded that existing Florida case law does not resolve the question of how section 768.81 is to be interpreted with regard to vicarious liability. Accordingly, the Eleventh Circuit certified the following question of law to this Court for instructions:
SHOULD A VICARIOUSLY LIABLE PARTY HAVE THE NEGLIGENCE OF THE ACTIVE TORTFEASOR APPORTIONED TO IT UNDER FLORIDA STATUTE § 768.81 SUCH THAT RECOVERY OF ITS OWN DAMAGES IS REDUCED CONCOMITANTLY?
Id. at 1258.
The Eleventh Circuit agreed with the district court's refusal to grant prejudgment interest to AHA. Both courts concluded that the damages incurred by S & S were unascertainable and speculative before the time of final judgment. Id. at 1259.

Indemnification Agreements and Sovereign Immunity Issues
KUA, FMPA, and B & V appealed the district court's summary judgment ruling that GE was not obliged to reimburse these parties for the expenses they had suffered in defending themselves, based on the indemnification provision in the purchasing agreement between KUA and GE. The district court had ruled that as a matter of law the attorney's fees and costs incurred were not within the scope of the indemnification provision. Id. at 1259. The Eleventh Circuit concluded that the district court improperly focused on Florida precedent that addresses the contractual duty to indemnify and hold harmless and failed to consider other precedent addressing the duty to defend. Id. at 1261-62. Nevertheless, the Eleventh Circuit concluded that the district court reached the correct result because "the plain language of the indemnification provision trumped the rules that otherwise would apply in the duty-to-defend context." Id. at 1263. The Eleventh Circuit concluded that the provision required GE to be held directly negligent for the collision before it could be required to reimburse the other parties for their attorney's fees or other legal expenses incurred in defending themselves. Id.
KUA and FMPA appealed the district court's summary judgment holding that KUA had to defend and indemnify both CSX and Amtrak based upon the crossing agreement between KUA and CSX, which included an indemnification provision. KUA and FMPA argued that the indemnity provision is void and unenforceable because KUA could not waive its sovereign immunity beyond that authorized by section 768.28, Florida Statutes (1997), absent specific legislative authority, and because under section 725.06, Florida Statutes (1997), the terms of the provision failed to meet the requirements for such provisions when contained in construction contracts. KUA and FMPA further argued that the crossing agreement was an exculpatory or *467 adhesion contract and a jury had to decide whether CSX possessed a superior bargaining position in executing the agreement; that the indemnity provision was inapplicable because CSX's negligent actions occurred in a location separate and apart from the railroad crossing; and that the district court erred in ruling that Amtrak was a beneficiary of the indemnity agreement. Id. at 1264. The Eleventh Circuit concluded that the sovereign immunity issue has not been directly resolved by this Court. Thus, the Eleventh Circuit refrained from addressing the other challenges to the indemnity provision. Id.
The Eleventh Circuit noted the following principles of sovereign immunity under Florida law: sovereign immunity applies to actions where the state is a party, unless the Legislature waives this immunity by general law; in the torts context, the Legislature has authorized a limited waiver of state sovereign immunity through section 768.28; and in Pan-Am Tobacco Corp. v. Department of Corrections, 471 So.2d 4, 5 (Fla.1984), this Court held that these statutory limitations do not apply in actions brought against the state for breach of contract. Nat'l R.R. Passenger Corp., 286 F.3d at 1264-65. KUA and FMPA argued that the indemnification provision goes far beyond what is authorized by section 768.28; CSX and Amtrak argued that section 768.28 is not applicable in this action, which involves a breach of contract. Id. at 1265-69. The Eleventh Circuit concluded that the sovereign immunity issues involve unanswered questions of Florida law that are not specifically addressed by controlling state precedent. Id. at 1269. Accordingly, the Eleventh Circuit certified three questions of law to this Court for review:
GIVEN THAT KISSIMMEE UTILITY AUTHORITY, A MUNICIPAL AGENCY UNDER FLORIDA LAW, AGREED BY CONTRACT TO INDEMNIFY A PRIVATE PARTY, IS THE AGREEMENT CONTROLLED BY THE RESTRICTIONS ON WAIVER OF SOVEREIGN IMMUNITY FOUND IN FLORIDA STATUTE § 768.28?
IS THE INDEMNIFICATION AGREEMENT INSTEAD CONTROLLED BY THE RULE FOR BREACH-OF-CONTRACT ACTIONS ENUNCIATED IN PAN-AM TOBACCO CORP. V. DEPARTMENT OF CORRECTIONS, 471 So.2d 4 (Fla.198[4])?
IF PAN-AM APPLIES, DOES A MUNICIPAL AGENCY LIKE KISSIMMEE UTILITY AUTHORITY LOSE THE PROTECTION OF SOVEREIGN IMMUNITY ONLY IF IT HAS SPECIFIC STATUTORY AUTHORIZATION TO ENTER INTO INDEMNIFICATION AGREEMENTS, OR IS IT SUFFICIENT THAT THE AGENCY MORE GENERALLY HAS STATUTORY AUTHORIZATION TO CONTRACT WITH PRIVATE PARTIES?
Id. at 1269.

First Certified Question: Comparative Fault of Vicariously Liable Party
In order to answer the first certified question, we first must examine the law relating to vicarious liability and comparative fault. The concept of vicarious liability can be described as follows: "A person whose liability is imputed based on the tortious acts of another is liable for the entire share of comparative responsibility assigned to the other." Restatement (Third) of Torts: Apportionment of Liability § 13 (2000). Vicarious liability is often justified on the policy grounds that it ensures that a financially responsible party will cover damages. Id. § 13 cmt. b. Thus, the vicariously liable party is liable for the *468 entire share of the fault assigned to the active tortfeasor. Id. The vicariously liable party has not breached any duty to the plaintiff; its liability is based solely on the legal imputation of responsibility for another party's tortious acts. Id. § 13 cmt. c. The vicariously liable party is liable only for the amount of liability apportioned to the tortfeasor. Id. § 13 cmt. e. In sum, the doctrine of vicarious liability takes a party that is free of legal fault and visits upon that party the negligence of another. 38 Fla. Jur.2d Negligence § 101 (1998).
In this case, the imputed liability is two-fold. S & S was held vicariously liable for Rountree's negligence under the inherently dangerous activities doctrine. This doctrine states that a party who "employs an independent contractor to do work involving a special danger to others which the employer knows . . . to be inherent in or normal to the work . . . is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger." Restatement (Second) of Torts § 427 (1965). An activity is inherently dangerous if the "danger inheres in the performance of the work," such that "in the ordinary course of events its performance would probably, and not merely possibly, cause injury if proper precautions were not taken." Florida Power & Light Co. v. Price, 170 So.2d 293, 295 (Fla.1964) (involving worker injured while working on wires charged with high voltage electricity); see also Channell v. Musselman Steel Fabricators, Inc., 224 So.2d 320 (Fla.1969) (involving plaintiff injured by steel beams being used in construction of building when the cable of equipment lifting a load of steel snapped); Baxley v. Dixie Land & Timber Co., 521 So.2d 170 (Fla. 1st DCA 1988) (involving an individual killed at a logging site when a sapling struck him in the head after a log was removed from the sapling that was bowed and under tension; trial court had found "the cutting, loading and delivering of logs" to be "inherently dangerous work"). Based on the immense weight of the turbine involved here and the size of the equipment required to transport it, we agree with the federal courts that the act of transporting the turbine to the power plant was inherently dangerous.
AHA insured S & S for the loss of the turbine. After settling the claim with S & S, AHA sued the railroads as S & S's subrogee. AHA has stepped into the shoes of S & S and is thus vicariously liable for Rountree's negligence.
In Hoffman v. Jones, 280 So.2d 431 (Fla.1973), this Court abolished contributory negligence in favor of the doctrine of comparative negligence. This Court reasoned that in tort law equitable results are best reached when fault is equated with liability. Id. at 438. "Comparative negligence does this more completely than contributory negligence, and we would be shirking our duty if we did not adopt the better doctrine." Id. This Court adopted the "pure form" of comparative negligence, stating that it was "the most equitable method of allocating damages in negligence actions." Id. Under this form of comparative negligence, each party is apportioned liability based on its percentage of fault. Id. This Court acknowledged that there will be cases in which this doctrine will result in a party that is more responsible for an accident recovering more than a party that is less responsible. But, this doctrine is designed to compute each party's liability based on the damages they caused as opposed to the damages they suffered. Id. at 439.
Section 768.81, Florida Statutes, codified the holding of Hoffman v. Jones. The applicable portions of the statute provide:

*469 (2) EFFECT OF CONTRIBUTORY FAULT.In an action to which this section applies, any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as economic and noneconomic damages for an injury attributable to the claimant's contributory fault, but does not bar recovery.
(3) APPORTIONMENT OF DAMAGES.In cases to which this section applies, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability;. . . .
§ 768.81(2)-(3), Fla. Stat. (1997).[3]
Nothing in the legislative history of this statute indicates an intention other than a direct codification of this Court's adoption of comparative liability. Section 768.81 was enacted as part of the comprehensive Tort Reform and Insurance Act of 1986. Comment and staff analysis of other sections of the act indicate that the focus of the bill as a whole was to remedy a "liability insurance crisis" in the mid-1980s. Ch. 86-160, § 60, at 755, Laws of Fla.
The Eleventh Circuit's first certified question asks how comparative fault applies in a case where, instead of an active tortfeasor's damage recovery being reduced by its percentage of apportioned negligence, a vicariously liable party has stepped into the active tortfeasor's shoes. AHA contends that the key word in the comparative fault statute is "fault." AHA argues that because neither it nor its subrogor, S & S, were found to be directly negligent, the comparative fault statute is not applicable. In contrast, the railroads note that the statute provides that any award of damages is to be diminished proportionately by "any contributory fault chargeable to the claimant." § 768.81(2), Fla. Stat. (1997) (emphasis added). The railroads contend that the plain meaning of the word chargeable is general enough to include a vicariously liable party, while AHA's interpretation of the statute would render the word "chargeable" mere surplusage. While there is no Florida case on point with this issue, there are several cases that give guidance on similar issues.
In Fabre v. Marin, 623 So.2d 1182, 1185 (Fla.1993), partly receded from by Wells v. Tallahassee Mem'l Reg'l Med. Ctr., Inc., 659 So.2d 249 (Fla.1995), this Court held that the comparative fault statute was unambiguous in stating that damage judgments should be entered against each liable party on the basis of that party's percentage of fault. Further, this Court concluded that in order to adequately apportion fault it is necessary to determine the fault of all entities that contributed to the accident and not just those who are defendants in the lawsuit. Id. at 1186-87.
AHA interprets this Court's holding in Fabre that damages are apportioned on the basis of percentage of fault as requiring direct negligence. AHA relies in part on Wal-Mart Stores, Inc. v. McDonald, 676 So.2d 12, 20 (Fla. 1st DCA 1996), approved sub nom. Merrill Crossings Assocs. v. McDonald, 705 So.2d 560 (Fla.1997), a decision in which the First District Court of Appeal interpreted "fault" under section 768.81 as equating to a defendant's amount of "negligence." However, the First District's analysis was narrowly aimed at distinguishing negligent acts *470 from intentional, criminal acts. The First District concluded that the Legislature did not intend for the language in section 768.81 to treat negligence and intentional, criminal acts the same. Thus, the First District found the comparative negligence statute inapplicable to intentional criminal conduct. Id. at 22.
AHA would have this Court apply the reasoning in Wal-Mart to the present case. AHA argues that because it and its subrogor, S & S, are innocent of fault, i.e., active negligence, the comparative fault statute does not apply to them. However, this argument ignores the premise that vicarious liability always involves liability without fault. As a matter of policy, the vicariously liable party carries the entire burden of fault imputed from the active tortfeasor. "The party who is vicariously liable is responsible to the plaintiff to the same extent as the primary actor." June F. Entman, The Nonparty Tortfeasor, 23 Mem. St. U.L.Rev. 105, 106 (1992). S & S was vicariously liable for Rountree's negligence and AHA, in turn, stepped in to S & S's shoes as a subrogee.
Our conclusion that section 768.81 applies to vicariously liable parties as well as active tortfeasors also harmonizes with Florida's contribution statute. See § 768.31(2)(e), Fla. Stat. (1997) (providing that a liability insurer who discharges the liability of a tortfeasor and thereby discharges its full obligation as the insurer is subrogated to the tortfeasor's right of contribution to the extent of the amount it has paid in excess of the tortfeasor's pro rata share of the common liability). The First District has held that an insurance company stands in the shoes of its insured with respect to the right to contribution. Sacred Heart Hosp. v. Frazier, 621 So.2d 491, 493 (Fla. 1st DCA 1993). Additionally, this Court has held that "an insurer cannot have a greater right than the insured through the remedy of subrogation." Fla. Patient's Comp. Fund v. St. Paul Fire & Marine Ins. Co., 559 So.2d 195, 197 (Fla.1990).
AHA also points to this Court's decision in Nash v. Wells Fargo Guard Services, Inc., 678 So.2d 1262, 1264 (Fla.1996), as precedent that fault and vicarious liability are not synonymous. In Nash, this Court held that "the named defendant cannot rely on the vicarious liability of a nonparty to establish the nonparty's fault." Id. This holding was in the context of putting the nonparty's name on a jury verdict form for the purpose of apportioning fault. Id. The instant case is readily distinguishable because the federal district court, reviewed and affirmed by the Eleventh Circuit, held that under the doctrine of inherently dangerous activities S & S was vicariously liable for the actions of Rountree. This determination was made after fault had already been apportioned to the liable parties by the jury.
AHA cites two additional cases to support its proposition that section 768.81 is not applicable to this case. However, both Wells v. Tallahassee Memorial Regional Medical Center, Inc., 659 So.2d 249 (Fla.1995), and J.R. Brooks & Son, Inc. v. Quiroz, 707 So.2d 861 (Fla. 3d DCA 1998), which deal with the issue of how to compute damages under the comparative fault statute when there has been a settlement, are readily distinguishable from the instant case. In Wells, this Court receded slightly from Fabre to prevent settlements from becoming a vehicle for abuse in the apportionment of economic and noneconomic damages. In all other respects, Wells conforms with the holding in Fabre that nonparties must be considered along with parties in the apportionment of fault for damage assessment. J.R. Brooks stands for the proposition that a plaintiff's damage award from a defendant whose *471 liability is based solely on vicarious liability must be reduced by the amount of the settlement entered into with the person that actually committed the negligent act. 707 So.2d at 863. The instant case involves no settlements. Thus, these cases do not support AHA's argument that the comparative fault statute does not apply when liability is based on imputed fault rather than direct liability.
The doctrine of vicarious liability allows for parties that are not at fault to be held liable for the actions of active tortfeasors. The Florida Legislature specifically included the word "chargeable" in the comparative fault statute. Unless this term is to be reduced to mere surplusage, it must be read to include parties other than those that are directly liable, and thus applies to vicariously liable parties such as AHA. As a policy matter, it would be a dangerous precedent to allow insurers, through subrogation, to have a greater right to damages than their insureds. Accordingly, we answer the first certified question in the affirmative.

Certified Questions on Sovereign Immunity
The Eleventh Circuit also certified three questions regarding the sovereign immunity of KUA and the effect, if any, of KUA's indemnification agreement with CSX. In order to answer these questions, we first examine the law relating to sovereign immunity.
The doctrine of sovereign immunity, which provides that a sovereign cannot be sued without its own permission, has been a fundamental tenet of Anglo-American jurisprudence for centuries and is based on the principle that "the King can do no wrong." The doctrine was a part of the English common law when the State of Florida was founded and has been adopted and codified by the Florida Legislature. See generally § 2.01, Fla. Stat. (2004). The original justification for incorporating the doctrine into American jurisprudence was "the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 51 L.Ed. 834 (1907). Florida law has enunciated three policy considerations that underpin the doctrine of sovereign immunity. First is the preservation of the constitutional principle of separation of powers. See Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1022 (Fla.1979) (stating that "certain functions of coordinate branches of government may not be subjected to scrutiny by judge or jury as to the wisdom of their performance"). Second is the protection of the public treasury. See Spangler v. Fla. State Tpk. Auth., 106 So.2d 421, 424 (Fla.1958) (explaining that "immunity of the sovereign is a part of the public policy of the state[, which] is enforced as a protection of the public against profligate encroachments on the public treasury"). Third is the maintenance of the orderly administration of government. See State Rd. Dep't v. Tharp, 146 Fla. 745, 1 So.2d 868, 869 (1941) ("If the State could be sued at the instance of every citizen, the public service would be disrupted and the administration of government would be bottlenecked.").
However, the Florida Constitution provides that the Legislature can abrogate the state's sovereign immunity. See art. X, § 13, Fla. Const. ("Provision may be made by general law for bringing suit against the state as to all liabilities now existing or hereafter originating."). Only the Legislature has authority to enact a general law that waives the state's sovereign immunity. Manatee County v. Town of Longboat Key, 365 So.2d 143, 147 *472 (Fla.1978). Further, any waiver of sovereign immunity must be clear and unequivocal. Id.; Rabideau v. State, 409 So.2d 1045, 1046 (Fla.1982). In interpreting such legislative waivers of sovereign immunity, this Court has stated that it must strictly construe the waiver. Longboat Key, 365 So.2d at 147. Moreover, waiver will not be found as a product of inference or implication. Spangler, 106 So.2d at 424.
Pursuant to its constitutional authority, the Legislature authorized a limited waiver of state sovereign immunity in tort for personal injury, wrongful death, and loss or injury of property through the enactment of section 768.28 in 1973. See ch. 73-313, § 1, Laws of Fla. Before this statute was enacted, the state and counties were immune from tort liability and all claims against the state had to be recovered through the claims bill process in the Legislature. Municipalities did not share this immunity from tort liability for their proprietary functions. See Hargrove v. Town of Cocoa Beach, 96 So.2d 130, 133 (Fla.1957) ("The modern city is in substantial measure a large business institution."); Kaufman v. City of Tallahassee, 84 Fla. 634, 94 So. 697, 699 (Fla.1922) ("[A] city is merely a large quasi public corporation whose activities partake more of the nature of a business than a government."); see also Fla. H.R. Comm. on Judiciary, HB 315 and 376 (1973), Staff Summary (on file in State Archives) ("Municipalities do not have this immunity [from tort liability]."). However, municipalities were "unequivocally included within the definition of `state agencies or subdivisions'" in section 768.28. Commercial Carrier Corp., 371 So.2d at 1016; see also ch. 77-86, at 161, Laws of Fla. ("Whereas, in enacting section 768.28, Florida Statutes, the Legislature clearly intended to make the state, the counties, and the municipalities liable for tort claims in the same manner and to the same extent as a private individual under like circumstances.") (emphasis added); Op. Att'y Gen. Fla. 77-241 (1977) (explaining that the limitations of liability established by section 768.28 apply to all agencies and subdivisions of the state, including municipalities, regardless of whether those agencies and subdivisions possessed sovereign immunity prior to July 1, 1974).
Section 768.28(1), Florida Statutes (1997), provides in pertinent part:
In accordance with s. 13, Art. X, State Constitution, the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act. Actions at law against the state or of any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act.

(Emphasis added.) Additionally, subsection (5) of the statute limits state liability to $100,000 per claimant and $200,000 per accident. Id. § 768.28(5).
The indemnity provision in the crossing agreement contract between KUA and CSX provides that KUA "assumes all liability for, and releases and agrees to defend, indemnify, protect and save [CSX] harmless" for all loss of or damage to property of CSX or third parties at the crossing or adjacent to it, all loss and *473 damage on account of injury to or death of any person on the crossing, and all claims and liabilities for such loss and damage. Private Road Grade Crossing Agreement, § 14.2, Record on Appeal at 53-1172 Ex. A, Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc., 286 F.3d 1233 (11th Cir.2002) (No. 6:93-cv-1090-Orl-19C) (agreement between KUA and CSX dated Apr. 26, 1993) (hereinafter "Crossing Agreement"). This contractual obligation applies regardless of cause and even if the injury, death, or property damage is caused solely by the negligence of CSX. Id. Further, this obligation also extends to "companies and other legal entities that control, are controlled by, are subsidiaries of, or are affiliated with [CSX], and their respective officers, agents and employees." Id. § 14.4. It is under this paragraph that Amtrak claims KUA is required to indemnify it as well.
In the second certified question, the Eleventh Circuit asks if the crossing agreement between KUA and CSX is controlled by the restrictions on the waiver of sovereign immunity imposed by section 768.28. Under the statute, immunity is only waived for "liability for torts" caused by "the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment." § 768.28(1), Fla. Stat. (1997). The statute also limits tort claim judgments against the state, its agencies, or subdivisions to $100,000 to any one person and $200,000 per incident. § 768.28(5), Fla. Stat. (1997). In the agreement at issue here, KUA agreed to assume responsibility for the negligence of CSX and its employees and for that of companies affiliated with CSX. Further, the provision placed no limit on the amount KUA has to pay out per claimant and per accident.
CSX and Amtrak argue that section 768.28 is not applicable here because the statute only governs tort actions and the instant case involves a breach of contract in that KUA did not fulfill its contractual obligation in the crossing agreement to defend and hold harmless CSX and Amtrak. KUA and FMPA cite a number of opinions issued by the Attorney General to support their argument that the indemnification agreement between KUA and CSX is controlled by the restrictions on the waiver of sovereign immunity in section 768.28. In the opinions cited, the Attorney General concluded that a state agency or subdivision of the state may not enter a contract agreeing to indemnify another party that would extend the government's liability beyond the limits established in section 768.28. See, e.g., Op. Att'y Gen. Fla.2000-22 (2000) (advising county that it may not agree to indemnify another party to a contract or alter the state's waiver of sovereign immunity beyond the limits established in section 768.28); Op. Att'y Gen. Fla. 99-56 (1999) (advising that Florida National Guard may not enter into a land use agreement that contains an indemnification agreement because authority to enter into contract does not encompass power to waive state's sovereign immunity beyond that provided in section 768.28); Op. Att'y Gen. Fla. 90-21 (1990) (advising that Department of Corrections is not authorized to alter by contract the state's waiver of immunity in tort provided in section 768.28).
Although an opinion of the Attorney General is not binding on a court, it is entitled to careful consideration and generally should be regarded as highly persuasive. See State v. Family Bank of Hallandale, 623 So.2d 474, 478 (Fla.1993). However, the Attorney General opinions cited by KUA and FMPA have ignored the plain language of section 768.28 and do not *474 apply under these circumstances, where the contracting party is a municipality, not a state agency. Thus, we do not find the Attorney General opinions to be "highly persuasive" in this case.
By its plain language, section 768.28 only applies to "actions at law against the state or any of its agencies or subdivisions to recover damages in tort." § 768.28(1), Fla. Stat. (1997) (emphasis added); see also Provident Mgmt. Corp. v. City of Treasure Island, 796 So.2d 481, 486 (Fla.2001) (concluding that section 768.28 "applies only when the governmental entity is being sued in tort"; thus, limitations of section 768.28 did not apply to restrict award of damages against governmental entity for the erroneous issuance of a temporary injunction). The indemnification provision at issue here is based on a contract between KUA and CSX. KUA entered into the crossing agreement with CSX, whereby CSX granted KUA a license to construct, use, and maintain a private road grade crossing over CSX's railroad tracks. For KUA, this crossing agreement ensured that there would be vehicular and pedestrian access to the power plant site. See Nat'l R.R. Passenger Corp., 286 F.3d at 1263. In return for receiving the license, KUA agreed to "defend, indemnify, protect, and save [CSX] harmless from and against [designated losses and casualties]." Crossing Agreement § 14.2. Based on the definition of the term "Railroad" in the agreement, KUA also agreed to defend and indemnify "any other company ... whose property [at the crossing] may be leased or operated by [CSX]" and "any parent, subsidiary or affiliated system companies of [CSX]." Id. § 1.2. In the indemnification provision, KUA specifically recognized that the use of "[CSX's] property, tracks, and right-of-way involves increased risks" and agreed to defend and indemnify CSX "as further consideration for the grant of this crossing right." Id. §§ 14.1-14.2. Thus, we conclude that the statutory provision governing tort recovery actions is not applicable here and answer the second certified question in the negative.
In its third certified question, the Eleventh Circuit asks whether the indemnification agreement between KUA and CSX is controlled by the breach-of-contract principles enunciated in Pan-Am Tobacco. We conclude that Pan-Am Tobacco does not control the agreement because that case addressed the contractual liabilities of the state, while municipalities historically have possessed liability for their contracts.
In Pan-Am Tobacco, this Court held that the state is not immune from suit for breach of contract and specifically stated that "[w]here the legislature has, by general law, authorized entities of the state to enter into contract or to undertake those activities which, as a matter of practicality, require entering into a contract, the legislature has clearly intended that such contracts be valid and binding on both parties." 471 So.2d at 5. Pan-Am Tobacco interpreted the contractual powers of the state. In contrast, municipalities have long possessed both the power to execute contracts and the concomitant liability for their breach.
Florida's Constitution provides that "[n]o money shall be drawn from the treasury except in pursuance of appropriation made by law." Art. VII, § 1(c), Fla. Const. The state may not employ state funds unless such use of funds is made pursuant to an appropriation by the Legislature. See State v. Fla. Police Benevolent Ass'n, Inc., 613 So.2d 415, 418 (Fla.1992) ("[E]xclusive control over public funds rest solely with the legislature."); Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260, 265 (Fla.1991) ("[T]his Court has long *475 held that the power to appropriate state funds is legislative and is to be exercised only through duly enacted statutes."). In State ex rel. Kurz v. Lee, 121 Fla. 360, 163 So. 859 (1935), this Court stated:
The object of a constitutional provision requiring an appropriation made by law as the authority to withdraw money from the state treasury is to prevent the expenditure of the public funds already in the treasury, or potentially therein from tax sources provided to raise it, without the consent of the public given by their representatives in formal legislative acts. Such a provision secures to the Legislature (except where the Constitution controls to the contrary) the exclusive power of deciding how, when, and for what purpose the public funds shall be applied in carrying on the government.
163 So. at 868. Therefore, Florida's Constitution expressly limits the state's ability to expend funds and enter contracts by requiring specific statutory authority. Several laws do grant various state agencies the express authority to execute contracts. See, e.g., §§ 125.012 (granting counties the power to contract relative to various project facilities such as toll roads, waterway facilities, dredging, utility agreements, etc.), 125.031 (granting counties the power to enter into leases and lease-purchase agreements involving land needed for public purposes), 153.62(11) (granting county district boards the power to contract with respect to water supply and sewage disposal), 163.370 (giving counties and municipalities the power to contract with respect to community redevelopment), 186.006(10) (granting the office of the Governor the power to contract respecting research facilities), 337.11 (authorizing the Department of Transportation to enter into contracts for road construction), 338.2216(b) (authorizing the Florida Turnpike Enterprise to contract to maintain the turnpike and promote its use), Fla. Stat. (2004). The Legislature also has authorized certain activities that implicitly grant state agencies the power to contract for necessary goods and services. See, e.g., §§ 20.315, 945.215, Fla. Stat. (2004).
In contrast to the specific contractual powers granted to the state, Florida's Constitution gives municipalities "governmental, corporate, and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services ... except as otherwise provided by law." Art. VIII, § 2(b), Fla. Const. The Municipal Home Rule Powers Act recognizes these same powers of municipalities, limited only when "expressly prohibited by law." § 166.021(1), Fla. Stat. (1997). Given this broad grant of power, we have held that municipalities may exercise any power for a municipal purpose "except when expressly prohibited by law." See, e.g., City of Ocala v. Nye, 608 So.2d 15, 16-17 & n. 3 (Fla.1992); City of Boca Raton v. Gidman, 440 So.2d 1277, 1280 (Fla.1983); see also Hargrove v. Town of Cocoa Beach, 96 So.2d 130, 133 (Fla.1957) (noting that "[t]he modern city is in substantial measure a large business institution").[4] In executing contracts, municipalities are presumed to be acting within the broad scope of their authority. Therefore, long before our decision in Pan-Am Tobacco, municipalities already were authorized to execute contracts and were liable for their breach.
In this case, the parties have failed to identify any law prohibiting KUA from executing the crossing agreement and the indemnification provision it contains. *476 Nor do they assert that KUA cannot exercise the powers of the City of Kissimmee. In fact, although KUA did not need an express grant of authority to execute the crossing agreement, it had one. The Interlocal Cooperation Act expressly authorized public agencies to contract with private parties regarding electrical projects. Specifically, the statute states:
The limitations on waiver in the provisions of s. 768.28 or any other law to the contrary notwithstanding, the Legislature, in accordance with s. 13, Art. X of the State Constitution, hereby declares that any such legal entity or any public agency of this state that participates in any electric project waives its sovereign immunity to:
....
2. Any person in any manner contracting with a legal entity of which any such public agency is a member, with relation to:
a. ownership, operation, or any other activity set forth in sub-subparagraph (b)2.d with relation to any electric project.
§ 163.01(15)(k), Fla. Stat. (1993).[5] This statute grants specific authority to KUA, if any were needed, to execute the crossing agreement.
KUA had the authority of the City of Kissimmee to enter into contracts for municipal services, including this crossing agreement, which ensured access to the power plant. As discussed above, CSX granted KUA a license to construct, use, and maintain a private road grade crossing across CSX's railroad tracks. In recognition of the increased risks associated with the use of CSX's property, tracks, and right-of-way and as part of the "consideration" for receiving this license, KUA agreed to assume all risk of loss and damage to its own property and also agreed to defend and indemnify CSX against any loss. Crossing Agreement §§ 14.1-14.2. The indemnification provision was part and parcel of the Crossing Agreement, a contract between KUA and CSX "fairly authorized" by Florida law. Thus, the indemnification agreement is binding and enforceable. Accordingly, we conclude that a municipal agency like KUA has the inherent authority to contract with private parties and enter into an indemnification agreement as part of a contract with a private party and may not invoke sovereign immunity to defeat its obligations under the contract.[6]

Conclusion
Accordingly, we answer the Eleventh Circuit's first certified question in the affirmative, the second question in the negative, the third question in the negative, and do not address the fourth question. Having answered the certified questions, we return this case to the United States Court of Appeals for the Eleventh Circuit.
It is so ordered.
PARIENTE, C.J., and ANSTEAD, LEWIS, CANTERO, and BELL, JJ., concur.
*477 CANTERO, J., concurs with an opinion, in which ANSTEAD and BELL, JJ., concur.
QUINCE, J., concurs in part and dissents in part with an opinion.
WELLS, J., recused.
CANTERO, J., concurring.
I concur in the majority opinion. I write to further explain the historical differences in our state constitution and our common law between the sovereign immunity of the state and that of municipalities. As I explain below, these common law differences dictate that the sovereign immunity of municipalities must be construed strictly, whereas the immunity of the state must be construed more broadly. Because this case involves a municipality, I read the majority opinion as deciding only whether a municipality may contractually indemnify a private party for its negligence, without limitation as to amount. Because of the historical differences between the sovereign immunity of the state and that of municipalities, we need not decide in this case whether the state may also contractually waive its sovereign immunity.
The partial dissent asserts that section 768.28 should apply because otherwise a state agency could circumvent the policies underlying sovereign immunity, and the restrictions on waiving such immunity, by including an indemnity provision in a contract. Whatever force this argument may have when applied to the state and its agencies (we do not decide that issue here), it ignores the broad powers conferred on municipalities to "exercise any power for municipal purposes, except when expressly prohibited by law." § 166.021(1), Fla. Stat. (1993) (emphasis added). It also ignores that, unlike the effect of section 768.28 on the immunity of the state, the statute actually granted partial immunity to municipalities that did not previously exist. Because the immunity the statute grants municipalities is in derogation of the common law, it must be strictly construed.
The state and municipalities differ in the degree of their historical sovereign immunity. Under the common law, the state's immunity was total. See Cauley v. City of Jacksonville, 403 So.2d 379, 381 (Fla.1981); Spangler v. Fla. State Tpk. Auth., 106 So.2d 421, 422 (Fla.1958) (holding that the state and its agencies are immune from suit); Smith v. City of Arcadia, 147 Fla. 375, 2 So.2d 725, 728 (1941) ("The State cannot be sued ....") (quoting Allison Realty Co. v. Graves Investment Co., 115 Fla. 48, 155 So. 745, 750 (1934)); State Road Dep't of Fla. v. Tharp, 146 Fla. 745, 1 So.2d 868, 869 (1941) ("[The] State cannot be sued without its consent. As to tort actions, the rule is universal and unqualified unless relaxed by the State...."). The 1868 Constitution granted the Legislature the power to waive it. See id. (citing art. IV, § 19, Fla. Const. (1868) (now art. X, § 13, Fla. Const.)). However, the Legislature declined to act until 1973, when it adopted section 768.28. See Ch. 73-313, Laws of Fla.
In contrast to the state, municipalities never enjoyed total immunity from suit. See Cauley, 403 So.2d at 381-83 (recognizing that state sovereign immunity "remained in full force until section 768.28's enactment" while municipal sovereign immunity became subject to many exceptions before the waiver statute); Woodford v. City of St. Petersburg, 84 So.2d 25, 26 (Fla.1955) (holding that a municipality exercising a proprietary function is liable in the same manner as private corporations); City of Tampa v. Easton, 145 Fla. 188, 198 So. 753, 754 (1940) ("Unlike a county, a municipality is not a subdivision of the State with subordinate attributes of sovereignty in the performance of governmental *478 functions...."); City of Tallahassee v. Fortune, 3 Fla. 19 (1850) (distinguishing precedent from the United States and England and holding that an action for trespass may lie against a municipal corporation); see also Cauley, 403 So.2d at 382-84 (outlining the development of municipal sovereign immunity law in Florida from Fortune through the enactment of section 768.28).
Before section 768.28, questions of whether municipal sovereign immunity applied were analyzed as follows:
1) as to those municipal activities which fall in the category of proprietary functions a municipality has the same tort liability as a private corporation;
2) as to those activities which fall in the category of governmental functions ". . . a municipality is liable in tort, under the doctrine of respondent [sic] superior, [. . .] only when such tort is committed against one with whom the agent or employee is in privity, or with whom he is dealing or is otherwise in contact in a direct transaction or confrontation."
3) as to those activities which fall in the category of judicial, quasi judicial, legislative, and quasi legislative functions, a municipality remains immune.
Cauley, 403 So.2d at 383 (quoting Gordon v. City of West Palm Beach, 321 So.2d 78, 80 (Fla. 4th DCA 1975)) (citations omitted); see also Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1015 (Fla.1979) (reviewing the history of municipal sovereign immunity and recognizing that before section 768.28 a municipality would be held liable for torts committed in the performance of proprietary acts).
Essentially, the state and its agencies, on the one hand, and municipalities, on the other, arrived at section 768.28 from opposite directions: the state from a status of near-total immunity; and municipalities from a status of near-nonexistent immunity. In fact, when the statute was first enacted, its effect on municipalities was unclear. In 1976, the Attorney General issued an opinion that "municipalities possessed no aspect of the state's sovereign immunity from tort liability upon which the waiver contained in s. 768.28, and the limitations specified therein, could operate." Op. Att'y Gen. Fla. 76-41 (1976). In other words, the Attorney General opined that section 768.28, including its limitation on the amount of damages, did not apply to municipalities because they did not enjoy any immunity from tort suits that could be waived. The Legislature quickly amended section 768.28 by adding the following language in subsection 5: "The limitations of liability set forth in this subsection shall apply to the state and its agencies and subdivisions whether or not the state or its agencies or subdivisions possessed sovereign immunity prior to July 1, 1974." Ch. 77-86, § 1, Laws of Fla.
Section 768.28, therefore, affected the State and counties differently than it did municipalities. As to the State, the statute waived its sovereign immunity up to specified limits. As to municipalities, the statute granted them immunity from judgments above those limits.
Section 768.28 nullified the common law affecting both the state and municipalities, and therefore must be strictly construed. See Carlile v. Game & Fresh Water Fish Comm'n, 354 So.2d 362, 364 (Fla.1977). But it nullified the common law in different ways. As to the state and its agencies, the statute waives traditional immunity. As to municipalities, however, it grants partial immunity. Therefore, in construing the statute strictly, it must be construed in favor of granting immunity to the state, but against granting it to a municipality.
*479 Section 163.01(15)(k), Florida Statutes (1993), is relevant to this issue. That section waives sovereign immunity for "[o]wnership, operation, or any other activity set forth in sub-subparagraph (b)2.d. with relation to any electric project." Because section 768.28 must be strictly construed against granting immunity to KUA, we must read section 163.01(15)(k), if the language allows such an interpretation, as allowing KUA to execute an indemnification agreement. There is no question that KUA would have had authority to sign such an agreement at common law, and nothing in either section 768.28 or section 163.01(15)(k) explicitly prohibits KUA from doing so. Therefore, strictly construing the immunity afforded to KUA in section 768.28, KUA had the authority to indemnify private parties for its own negligence as well as theirs.
My conclusion that section 768.28 does not prohibit municipalities from indemnifying private parties is confirmed by the lack of any effect on state funds of a judgment against municipalities. Section 768.28 limits damages amounts because the state will have to pay any judgments. That is not the case, however, for judgments against municipalities. Here, any judgment against KUA will be paid from KUA funds. As KUA acknowledges, the state will not pay a dime. Therefore, the state's interest in whether KUA should be allowed to indemnify private parties is minimal.[7]

CONCLUSION
As the majority holds, section 768.28 does not apply because KUA's indemnification was contained in a contract, which is outside the parameters of section 768.28. Even if 768.28 does apply, however, given the lack of sovereign immunity in the common law for municipalities committing torts, the statute must be strictly construed against a finding of immunity as applied to municipalities. In this case, KUA voluntarily agreed to indemnify the railroad companies for any negligence on their part. Municipalities historically have been granted broad powers to exercise their authority. No law expressly prohibited KUA's action. Therefore, its agreement should be enforced.
ANSTEAD and BELL, JJ., concur.
QUINCE, J., concurring in part, dissenting in part.
While I concur in the majority's analysis of the comparative fault issue, I do not agree with its analysis of the sovereign immunity issue or its answer to the second question posed by the Eleventh Circuit Court of Appeals on the sovereign immunity issue.
The Eleventh Circuit asked whether the indemnification provision in the crossing agreement between Kissimmee Utility Authority (KUA), a municipal utility agency, and CSX Transportation (CSX) is controlled by the restrictions on the waiver of sovereign immunity found in section 768.28. I would answer this question affirmatively. In the alternative, the Eleventh Circuit asked whether the indemnification provision was controlled by the rule for breach-of-contract actions which was established by this Court in Pan-Am Tobacco Corp. v. Department of Corrections, 471 So.2d 4 (Fla.1984). In light of my answer to the second certified question, I would answer this question negatively.
*480 By enacting section 768.28, the Florida Legislature has exercised its constitutional authority to waive the state's sovereign immunity for liability in tort, but "only to the extent specified in [the statute]." § 768.28(1), Fla. Stat. (1997). The statute provides that the damages or injuries for which the state waives its immunity are those "caused by the negligent or wrongful act or omission of any employee of the agency or subdivision [of the state] while acting within the scope of the employee's office or employment." Id. § 768.28(1) (emphasis added). Further, the state's liability in such actions is limited to $100,000 per claimant and $200,000 per accident. Id. § 768.28(5). By the plain language of the statute, the state has only waived its immunity for the negligence or wrongful acts of a state employee who is acting within the scope of his or her employment. And even in these circumstances, the amount of the state's monetary liability is limited.
The indemnity provision in the crossing agreement between KUA and CSX goes far beyond the statutory waiver of sovereign immunity contained in section 768.28. Here, KUA has agreed to assume responsibility for the negligence of CSX and its employees and for that of companies affiliated with CSX. Further, the provision does not limit the amount KUA has to pay out per claimant or per accident as specified in section 768.28(5).
The majority concludes that section 768.28 is not applicable here as it only governs tort recovery actions against a governmental entity, whereas the instant case involves a contractual obligation. Majority op. at 474. While the crossing agreement is a contract, the provision at issue clearly relates to tort liability. Under the majority's reasoning, a governmental entity can do by contract what it does not have the authority to otherwise do, i.e., waive sovereign immunity for tort liability beyond the limits specified by the Legislature in section 768.28. Thus, any state agency or subdivision could circumvent the policies underlying sovereign immunity and the constitutional restrictions on the waiver of sovereign immunity by simply including an indemnity provision in a contract and agreeing to assume responsibility for individuals not employed by the state. Such an end-around Florida's Constitution smacks of gamesmanship.
Our decision in Florida Department of Natural Resources v. Garcia, 753 So.2d 72 (Fla.2000), is instructive in the instant case. In Garcia, this Court addressed an indemnification clause in a management agreement between the City of Miami Beach and the State of Florida for the management of South Beach. This indemnification agreement required the City to reimburse the State for any liability arising solely from ownership of the beach. The State argued that the indemnification provision was prohibited by section 768.28(18),[8] which prohibits one government entity from indemnifying a second government entity for the second's negligence. This Court concluded that the plain language of the statute did not prohibit this agreement whereby the City agreed to indemnify the State for the City's own negligence. Id. at 77. The Court noted that this interpretation of section 768.28(18) was consistent with the common law right of indemnification in that a non-negligent party who is vicariously liable for the tortious actions of another can seek indemnification from the tortfeasor. Thus, at common law, the State would have been able to seek indemnity from the City if the State was without *481 fault and held vicariously liable for the City's failure to keep South Beach reasonably safe. Id. at 78. The legislative history of this subsection explains that it was the Legislatures intent that "each entity [remain] liable for its own negligent acts or omissions." Fla. S. Comm. on Govtl. Ops., SB 1730 (1993) Staff Analysis (final Mar. 2, 1993) (on file in State Archives). If a government entity cannot indemnify another government entity for the second's negligence without express statutory authorization, why should a government entity be able to indemnify a private entity for the private entity's negligence without similar express authorization? It should not. Accordingly, I conclude that the contractual provision whereby KUA agreed to indemnify CSX and its affiliates for tort liability is controlled by the restrictions on the waiver of sovereign immunity found in section 768.28.
In light of my affirmative answer to the above question, I necessarily answer the questions relating to the applicability of Pan-Am Tobacco in the negative. In Pan-Am Tobacco, this Court concluded that despite the lack of an analogous waiver of sovereign immunity in contract a state agency or subdivision could not claim this defense in a breach-of-contract action on an express, written contract which the agency has the statutory authority to enter. 471 So.2d at 6. For the reasons explained below, I conclude that the indemnity provision in the instant contract does not fall under the breach-of-contract rule of Pan-Am Tobacco.
I agree with the majority that KUA had the authority of the City of Kissimmee to enter into contracts for municipal services, including the crossing agreement to gain access to the power plant. Majority op. at 476; see also art. VIII, § 2(b), Fla. Const. ("Municipalities shall have governmental, corporate, and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, except as otherwise provided by law."); § 166.021(1), Fla. Stat. (1997) ("Municipal Home Rule Powers Act" granting municipalities the powers provided in article VIII, section 2(b) of the Florida Constitution); § 163.01(2), Fla. Stat. (1997) ("Florida Interlocal Cooperation Act of 1969" permitting local governmental units to make the most efficient use of their powers by cooperating with other localities through interlocal agreements). However, both the constitutional provision and the Municipal Home Rule Powers Act recognize that the powers of a municipality may be limited when "otherwise provided by law." The Florida Interlocal Cooperation Act does not grant any additional authority to the public agencies participating in an interlocal agreement. Instead the agencies may "exercise jointly ... any power, privilege, or authority which such agencies share in common and which each might exercise separately." § 163.01(4), Fla. Stat. (1997); see also Op. Att'y Gen. Fla.2003-03 (2003) (explaining that an interlocal agreement entered into pursuant to section 163.01(4) may not confer any greater or additional power, privilege, or authority than is possessed by each of contracting agencies or permit exercise of powers not shared in common and not separately exercisable by each such agency). Furthermore, only the Legislature has the constitutional authority to waive the state's sovereign immunity. See art. X, § 13, Fla. Const.; Manatee County v. Town of Longboat Key, 365 So.2d 143, 147 (Fla.1978).
The power of a state agency or subdivision to enter into a contract with private parties does not encompass the power to extend the government's liability beyond the limits established in section 768.28. See, e.g., Op. Att'y Gen. Fla.2000-22 (2000) (advising county that it may not agree to *482 indemnify another party to a contract or alter the state's waiver of sovereign immunity beyond the limits established in section 768.28); Op. Atty Gen. Fla. 99-56 (1999) (advising that Florida National Guard may not enter into a land use agreement that contains an indemnification agreement because authority to enter into contract does not encompass power to waive state's sovereign immunity beyond that provided in section 768.28); Op. Att'y Gen. Fla. 90-21 (1990) (advising that Department of Corrections is not authorized to alter by contract the states waiver of immunity in tort provided in section 768.28). While the indemnity agreement may have been included in a contract which KUA had the power to enter, the indemnity agreement itself involves a waiver of the state's liability in tort, which KUA is not authorized to change. Thus, the indemnity agreement is not controlled by Pan-Am Tobacco.
Under the majority's reasoning, any government entity could waive the state's sovereign immunity by simply including such a proviso in a contract relating to some activity or enterprise which the entity was otherwise authorized to participate in. KUA should not be allowed to accept liability for the negligence of others "merely because accepting it is consideration [in a contract] for the acquisition of a valuable right." Seaboard Air Line R.R. Co. v. Sarasota-Fruitville Drainage Dist., 255 F.2d 622, 623 (5th Cir.1958).
For the reasons expressed above, I would find that the indemnification provision of the crossing agreement is controlled by the restrictions on the waiver of sovereign immunity and not by Pan-Am Tobacco.
NOTES
[1] See State v. Fla. Mun. Power Agency, 428 So.2d 1387, 1388 (Fla.1983) (stating that FMPA is a legal entity organized, pursuant to section 163.01, Florida Statutes (Supp.1982), for the purpose of joint acquisition, construction, and ownership of electricity-generating facilities by municipalities and other public entities).
[2] This formula deducted the value of the equipment in boxes 2-45, which were shipped separately and not involved in the collision, from the value of all the customized turbine equipment in boxes 1-45 before the collision.
[3] The turbine collision occurred in 1992. Prior to the damages phase of the trial, the Florida Legislature amended the statute in 1999. However, the 1999 amendment did not change the substantive language quoted above. The Eleventh Circuit applied the 1997 version of the statute. See Nat'l R.R. Passenger Corp., 286 F.3d at 1255 n. 23.
[4] The 1885 Constitution, unlike the present one, granted municipalities only those powers expressly granted by law. See Gidman, 440 So.2d at 1280.
[5] The "other activity set forth in sub-subparagraph (b)2.d" is broad and includes

the planning ... licensing, acquisition, construction, completion, management, control, operation, maintenance ... modification... or disposal, or all of the foregoing of such electric project by any one or more of the parties to such agreement....
§ 163.01(15)(b)2.d., Fla. Stat. (1993).
[6] In light of our determination that Pan-Am Tobacco does not apply to municipalities we need not address the fourth certified question.
[7] The State has filed a brief in this Court supporting the KUA's position. That brief, however, fails to recognize the historical distinction in the law between the sovereign immunity of the state and that of municipalities. In this case, the agreement was solely between the KUA and certain railroad companies. Therefore, the State's concerns do not apply.
[8] This provision was renumbered as section 768.28(19) when the Legislature amended the statute in 2003. See ch. 2003-416, § 67, Laws of Fla.