ALTENBERND, Judge.
Kay Y. Smyth, as personal representative of the Estate of Edward E. Smyth, Jr., appeals a summary final judgment in favor of Infrastructure Corporation of America (ICA) and the Florida Department of Transportation (DOT). This case involves a tragic automobile accident in which Mr. Smyth died. As explained below, his Estate maintains that the accident *906 was caused by the negligence of the operator of a large mowing tractor, who was driving in the fast lane of an interstate highway at less than 30 miles per hour at 9:00 p.m. in November, long after sunset. The tractor was owned and operated by an uninsured and unauthorized subcontractor, Titan Lawn Service. Its employee, Franklin Williamson, was mowing the interstate right-of-way under a contract between DOT and ICA. Although the trial court did not explain its reasons for granting this summary judgment, DOT and ICA maintain that the driver of the mowing tractor either was not negligent as a matter of law or that his negligence did not cause the accident. They further maintain that they are not legally responsible for the actions of this subcontractor.
From our review of this unusually limited record, DOT and ICA clearly have not established the absence of a question of fact as to the negligence of the operator of the tractor or his causal role in this accident. See Christian v. Overstreet Paving Co., 679 So.2d 839, 840 (Fla. 2d DCA 1996); Snyder v. Cheezem Dev. Corp., 373 So.2d 719, 720 (Fla. 2d DCA 1979) (“If the record reflects the existence of any genuine issue of material fact, or the possibility of any issue, or if the record raises even the slightest doubt that an issue might exist, summary judgment is improper.”). In fairness to the trial court, we doubt that it granted summary judgment on this theory.
The more challenging issue is whether the duty to use reasonable care in the operation of such large mower tractors on the paved portions of interstate highways is the type of activity for which the duty should be nondelegable. The trial court apparently determined that the record in this case established as a matter of law that this duty could be delegated and had been successfully delegated to Titan. We have considered holding that such an operation is nondelegable as a matter of law in this case. However, given the limited record, we simply hold that the trial court erred in determining that the duty could be delegated and had been successfully delegated to Titan. On remand, the trial court should allow the record to be fully developed concerning the operation of these tractors and then should make a determination as to these issues.
I. THE ACCIDENT
On November 15, 2006, at approximately 9:00 p.m., Edward E. Smyth was driving south on 1-75 near Riverview. His car was one of several cars that were driving in a closely spaced group in the fast lane. The fourth or fifth car in this pack happened to be a state trooper. The trooper testified that the first car slammed on its brakes and that the second or third car veered into the right-hand lane. That car, operated by Mr. Smyth, slammed into a slower moving tank truck carrying fuel. The impact locked Mr. Smyth’s car to the tank truck and breached the tank. At first, the driver of the truck did not realize what had happened. He continued to drive down the interstate with Mr. Smyth’s car trapped to the rear of his trailer. The truck’s large fuel tank caught fire. Mr. Smyth died in the inferno.
The trooper testified that immediately in front of the car that slammed on its brakes, there was a “giant lawn mower type tractor on the interstate.” Although the operator of this tractor had turned on the lights required for normal use of such a mowing rig, the tractor was not mowing on the right-of-way, but rather was physically on the roadway in the fast lane traveling at approximately 25 miles per hour in the dark of night. This is the tractor that was owned by Titan Lawn Service and operated by the owner of Titan, Mr. Williamson.
Further investigation indicated that the vehicle behind Mr. Smyth had been unable *907 to come to a stop when the cars all slammed on their brakes. That pickup truck hit Mr. Smyth’s car on its left rear bumper, presumably propelling Mr. Smyth into the lane where he collided with the tank truck.
We note that the record in this case is very unusual for an appeal of a summary judgment of an automobile accident resulting in death. There are no photographs of the accident in the record. There are no photographs of the mower tractor or other vehicles. Although law enforcement was required to complete a Florida Traffic Crash Report, Long Form, pursuant to section 316.066, Florida Statutes (2006), no such report is contained in our record. No deposition of the investigating officer or of any expert is in our record. Most of the depositions in the record are partial copies or excerpts of depositions. Oddly, there is no information about or deposition from the first driver in this pack who came upon the tractor. There are no affidavits concerning the issue of negligence.
The only report in the record describing the accident is a report prepared by Mes-ser R. Gilchrist. He is a retired DOT safety manager who is employed by ICA as a safety officer. That report describes the accident as follows:
On Thursday I received a call from Ernie Molina informing me that a vehicle crash involving one of ICA’s mowing contractors resulting in a fatality, and injuries to private parties that occurred the previous evening and requesting I conduct an investigation.
I arrived at the Tampa office Friday morning and conducted an investigation of the incident.
I interviewed Ernie Molina and Randy Eddings and was advised of the particulars of this incident. Based on these interviews and my investigation here is a description of what occurred:
At approximately 9:00 PM on Wednesday, November 15, 2006 a large tractor with a batwing mower attached, operated by Franklin Scott Williamson, the owner of Titan Lawn Service, was mowing the median in the south bound lanes of 1-75 traveling northbound. Just north of Gibsonton Drive the operator decided that he was finished and was going to park the mower on the west side of the Interstate. He turned the mower around and now heading southbound moved into the inside lane at approximately 30 MPH attempting to cross three lanes of traffic. This caused traffic to have to dodge the tractor. He continued south for approximately 2 miles and then pulled back into the median. At this time a southbound Hyundai saw the tractor, panic braked to avoid the tractor and was struck in the rear by a southbound Toyota Tundra pick up truck. The impact caused the Hyundai to skid into the side of a passing gasoline tanker truck. This collision caused the two vehicles to catch fire. The driver of the tanker truck pulled the truck off the west side of the road with the Hyundai jammed underneath it. The driver of the tanker truck stopped the vehicle and exited the truck just before the tanker exploded. The driver of the Hyundai was killed in the fire. Causative Factors:
Contract mower operating mower during the hours of darkness and in violation of the hours permitted in the contract. Mower attempting to cross three lanes of fast moving traffic driving at a slow speed in a high speed lane. Mr. Williamson stated that he did not know that he was not permitted to mow at night.[1]
*908 The driver of the tractor apparently has given varying statements about the location of his tractor and his actions at the time of this accident. To the extent that his testimony is needed for summary judgment, it is subject to issues of credibility. The ICA employee who entered into the subcontract with Titan admitted in his deposition that he believed that it was negligent to operate a mower tractor on the interstate at nighttime.
II. THE MOWING CONTRACTS AND THE ASSOCIATED INSURANCE COVERAGE
Much of the discovery in our record addresses the contractual arrangements for mowing this section of the interstate. It appears undisputed that ICA entered into a seven-year contract with DOT, identified as B-C 680, on June 7, 2000. This contract is a “highway asset management” contract that involved maintenance of rest stops, bridges, and activities in addition to mowing. This is a multi-million dollar contract. Including exhibits, this contract is about forty-five pages in length and it adopts by reference many additional manuals and publications applicable to ICA’s activities. The additional manuals and publications are generally not in our record.[2]
In the opening pages of the DOT contract, ICA agrees for separate consideration to defend and indemnify DOT for all claims arising out of the actions of its employees or subcontractors. ICA further agrees to maintain a policy of general liability insurance with a company authorized to do business in Florida affording public liability insurance with limits of at least $1,000,000 per person and $5,000,000 for each occurrence. These limits, of course, are well above the limited liability of the DOT under sovereign immunity. See § 768.28(5), Fla. Stat. (2006).
Section 7 of the contract addresses “assignment and subcontractors.” It requires ICA to maintain “adequate and competent staff’ and permits ICA to utilize subcontractors. As to subcontractors, the contract provides:
The Contractor [ICA] is fully responsible for satisfactory completion of all subcontracted work. The Contractor, however, shall not sublet, assign or transfer any work under this Agreement to other than subcontractors specified in the proposal, bid and/ or Agreement without the written consent of the Department.
It is undisputed that ICA subcontracted with “Titan Lawn Service” in 2006 for Titan to perform mowing services in the region where this accident occurred. Titan was not a listed potential subcontractor, and it is undisputed that ICA did not obtain consent from the DOT to enter into this subcontract.
ICA entered into a very basic contract with Titan on August 7, 2006. This agreement was supplemented with a longer agreement on November 9, 2006. The agreement does not expressly require Titan to fulfill all of ICA’s performance requirements for mowing under the DOT contract, although that may have been ICA’s intent. Like the DOT contract, it has an indemnity clause requiring Titan to defend and indemnify both ICA and DOT.
The ICA contract with Titan requires Titan to maintain insurance. Oddly, it does not require insurance that fulfills its obligations under the DOT contract. Instead it requires $100,000 per person and $500,000 per occurrence. Apparently in *909 August 2006, Titan provided a certifícate of insurance to ICA. This document is nearly illegible in the record. It is, however, only an informational certificate. ICA was not named as an additional insured or given any assurances that it would be notified in the event of a cancellation. To the extent it is legible, the certificate appears to state that Titan has $1,000,000 per occurrence coverage, which is 20 percent of the coverage required by DOT. •
Apparently, Titan had not disclosed to its insurer that it had a contract to perform “lawn service” on interstate rights-of-way. When its insurance company discovered the work that Titan was performing, it allegedly cancelled the insurance. We say “allegedly” because the record does not contain any deposition of any representative of an insurance company. It does not contain the notices of cancellation. Instead, it contains deposition testimony about this development, which testimony may be hearsay. The record does not even disclose the date on which this coverage was cancelled. Apparently, ICA was not directly notified of the cancellation by the insurance company because it was not an additional insured on the policy.
The ICA supplemental contract, which is dated only a few days before this accident, expressly required Titan to include ICA as an additional insured on the policy. From the record, it is unclear why ICA did not take steps under its contract to assure that this coverage was in place before the accident on November 15. The record is unclear on the subject, but it appears likely that Titan’s coverage was not cancelled between November 9 and November 15. It presumably was cancelled prior to the supplemental contract. The record does not rule out the probability that ICA had actual notice that the coverage was not in place on the day of this accident. The record does not explain why ICA entered into the supplemental contract before it actually received the required proof of coverage. In early November 2006, it actually appears that ICA should have suspended Titan’s services until Titan obtained coverage. It should not have allowed Titan to operate without coverage during the daylight, much less at night.
Concerning safety, the ICA supplemental contract has only three subsections. It incorporates by reference the “Florida Department of Transportation Accident Prevention Procedures Handbook.” Based on the testimony in the record, ICA did not provide a copy of that accident prevention handbook to Titan or conduct safety training of any sort,for Titan’s employees ór require that Titan conduct its own safety training.
Section 4.3.2 of the ICA supplemental contract provided:
In general, all maintenance work shall be performed between the hours of 9 a.m. to 4 p.m. For special operations, night work may be allowed between the hours of 7 p.m. to 5 a.m., with proper lighting, if so authorized by the written approval of the ICA Resident Maintenance Engineer. No work shall be done when weather conditions limit good visibility to less than five hundred (500) feet.
Despite this contractual requirement, there is a dispute in the record about whether Mr. Williamson knew he should not work after dark. He claimed to be unaware of the prohibition against such unauthorized night work. The record contains no forms that he might have used to obtain approval for this night work. It contains no examples of such written approval prior to this accident.
There is some dispute in the record as to why Mr. Williamson was working late on November 15. He claimed that he was trying to get ahead to give workers extra time at Thanksgiving. While the testimo *910 ny may not have been admissible in its present form, at the time of summary judgment there was also some evidence that he may have been out mowing at night to work off “steam” following an argument. There is at least some discussion in the evidence that Titan may have had difficulty fulfilling the full scope of the contract during normal work hours.
III.THE LAWSUIT
Kay Y. Smyth, as personal representative of the Estate of Mr. Smyth, filed this wrongful death action against the owner and the driver of the pickup truck that was behind Mr. Smyth’s car, and against Mr. Williamson, Titan Lawn Service, ICA, and DOT. The case as to the owner and driver of the pickup has been resolved. The claim against Titan has been discharged in bankruptcy.
The claims against DOT and ICA are virtually identical. The Estate maintains that each defendant negligently failed to supervise or instruct Mr. Williamson in the safe operation of this mower rig adjacent to an interstate highway. It also maintains that both DOT and ICA have a non-delegable duty to maintain the right-of-way in a manner that is reasonably safe for motorists traveling on the interstate.
The Estate unsuccessfully sought to obtain a summary judgment on liability. Thereafter, DOT and ICA, who have joint representation,[3] sought summary judgment. Based on the depositions and documents in the record, the trial court granted that summary judgment. The Estate has appealed that summary judgment.
IV. THIS CASE WAS NOT RIPE FOR SUMMARY JUDGMENT ON THE NEGLIGENCE OF THE TRACTOR OPERATOR
Although the judgment does not explain the trial court’s reasoning, from the transcript of the hearing it does not appear that this experienced trial judge granted a summary judgment on the theory that the driver of the mower could not be found negligent for operating a slow-moving mowing rig in the fast lane of the interstate in the dark. ICA correctly argues that the Estate cannot directly explain, without at least one inference from circumstantial evidence, why Mr. Smyth applied his brakes because Mr. Smyth is dead and is not available to testify. His death is not a basis for entry of summary judgment. See Majeske v. Palm Beach Kennel Club, 117 So.2d 531 (Fla. 2d DCA 1959).
In light of the eyewitness testimony of the trooper, there is strong direct and circumstantial evidence that the first car, if not all of these cars, was taking evasive action to avoid the tractor. This is the conclusion that even ICA’s own safety investigator reached. In light of the limited record on this issue, DOT and ICA simply have not presented the evidence needed to fulfill the heavy burden placed on a mov-ant for summary judgment in this type of negligence case. See Jiminez v. Faccone, 98 So.3d 621 (Fla. 2d DCA 2012).
V. THIS CASE WAS NOT RIPE FOR SUMMARY JUDGMENT ON THE ISSUE OF NONDELEGABILITY
The general rule that a landowner or other employer of an independent contractor is not liable for the negligent acts of the independent contractor is subject to *911 numerous exceptions. See Webb v. Priest, 413 So.2d 43, 47 n. 2 (Fla. 3d DCA 1982); Restatement (Second) of Agency § 214 (2006). The exceptions most relevant in this case are those that address work that creates special or exceptional risks.
Although there may be occasion for this issue to be one of fact,[4] the courts tend to treat this issue as a question of legal duty and, thus, as a question of law. See Estate of Johnson ex rel. Johnson v. Badger Acquisition of Tampa, 983 So.2d 1175 (Fla. 2d DCA 2008). As such; when the circumstances warrant, courts determine whether a particular risk creates a nondel-egable duty. See Am. Home Assurance Co. v. Nat’l R.R. Passenger Corp., 908 So.2d 459, 468 (Fla.2005) (holding that transportation of a large turbine created nondelegable duties). The difficulty we have in this case is that the facts concerning this mowing operation are not well developed in the record.
In this case, the Estate would have this court hold that all highway maintenance involving large mowers creates non-delegable duties. The facts of this case do not warrant such a broad holding. In remanding this case to the trial court, we would encourage the trial court to focus on the dangers created by such mowers on the paved portion of interstate highways or other similar limited access highways.
The operation of these mowers arguably falls within the definition of an inherently dangerous activity. In Atlantic Coast Development Co. v. Napoleon Steel Contractors, Inc., 385 So.2d 676 (Fla. 3d DCA 1980), for example, the court reconfirmed the established law in Florida that the risks associated with the operation of cranes is nondelegable because such conduct is “inherently dangerous.”[5]
The supreme court recently described the nature of inherently dangerous activity in American Home, 908 So.2d at 468:
An activity is inherently dangerous if the “danger inheres in the performance of the work,” such that “in the ordinary course of events its performance would probably, and not merely possibly, cause injury if proper precautions were not taken.” Florida Power & Light Co. v. Price, 170 So.2d 293, 295 (Fla.1964) (involving worker injured while working on wires charged with high voltage electricity); see also Channell v. Musselman Steel Fabricators, Inc., 224 So.2d 320 (Fla.1969) (involving plaintiff injured by steel beams being used in construction of building when the cable of equipment lifting a load of steel snapped); Baxley v. Dixie Land & Timber Co., 521 So.2d 170 (Fla. 1st DCA 1988) (involving an individual killed at a logging site when a sapling struck him in the head after a log was removed from the sapling that was bowed and under tension; trial court had found “the cutting, loading and delivering of logs” to be “inherently dangerous work”).
American Home involved a collision between a train and a special truck rig that was carrying a very heavy combustion turbine engine across the tracks. The truck crew needed to adjust the height of the hauler to clear the railroad tracks. It failed to do so and the hauler got stuck on the tracks, resulting in the collision. Id. at 462-64.
The legal theory that conduct is inherently dangerous, as in the case of a *912 crane or the transport of a large turbine, does not mean that accidents are inevitable or unavoidable. Instead, it is probably a fair description of this common law doctrine that it examines and evaluates risks that create a much higher than usual likelihood of accidents in which there is a much higher than usual likelihood of major loss, injury or damage. While the doctrine does not heighten anyone’s standard of care from the normal negligence standard, it recognizes that the consequences of negligence in these special circumstances justify placing an economic incentive on landowners and primary contractors to assure that work on such highly dangerous activity is safely performed by trained workers who have the financial responsibility to compensate persons injured by these unusual risks.[6] Although this record at least suggests that operating these mowers on the paved portion of the interstate may create an unusually high risk of accidents involving major losses, we are unconvinced that the record was sufficient to support a summary judgment on this issue for either side.
The law relating to inherently dangerous work and nondelegable duties is extensively discussed in the Restatement (Second) of Torts. The American Home decision, for example, was based, in part, on section 427 of the Restatement (Second) of Torts (1965), which states:
§ 427. Negligence As To Danger Inherent In The Work
One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor’s failure to take reasonable precautions against such danger.
Although section 427 may also apply in this case, we have also considered section 416 of the Restatement (Second) of Torts, which describes a somewhat narrower set of risky circumstances in which liability is nondelegable:
§ 416. Work Dangerous In Absence Of Special Precautions
One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.
Restatement (Second) of Torts § 416 (1965).
There are other sections of the Restatement that were not considered when the trial court granted summary that the trial court may wish to consider in making its decision on remand. See, e.g., Restatement (Second) of Torts §§ 417, 422, 423, 424, 427A, 428, 429 (1965). Section 418 of the Restatement (Second) of Torts, for example, is entitled “Maintenance of Public Highways and Other Public Places” and it states:
(1) One who is under a duty to construct or maintain a highway in reasonably safe condition for the use of the public, and who entrusts its construction, maintenance, or repair to an independent contractor, is subject to the same liability for physical harm to persons using *913 the highway while it is held open for travel during such work, caused by the negligent failure of the contractor to make it reasonably safe for travel, as though the employer had retained the work in his own hands.
(2) The' statement in Subsection (1) applies to any place which is maintained by a government for the use of the public, if the government is under the same duty to maintain it in reasonably safe condition as it owes to the public in respect to the condition of its highways.
Whether “maintenance” should include the activities involved in this case is not a matter that we can resolve from this record.
Section 426 of the Restatement (Second) of Torts provides that an employer will not be responsible for negligence caused by an independent contractor when (1) the contractor’s negligence consists solely in the improper manner in which he does the work, (2) it creates a risk of such harm which is not inherent or normal to the work, and (3) the employer had no reason to contemplate the contractor’s negligence when the contract was made. Again, from the record, we are uncertain how this provision may apply in this case.
Of particular concern to this court has been the lack of information about the frequency with which such tractor mowing rigs need to cross multiple lanes of interstate traffic or travel along the roadway in order to perform these maintenance contracts. Anyone who has ever attempted to cross an interstate highway on foot realizes that estimating speeds and appreciating the timing on this activity is not easy. Anyone who has ever driven on an interstate realizes that the speed of extremely slow vehicles can be very difficult to estimate. The record does not establish what, if any, training has been required by DOT or ICA concerning this activity. The record simply is insufficient to determine how to resolve this case under the applicable law.
We have provided detailed information about the contracts and insurance in this case for two reasons. First, it appears that DOT is already working under the assumption that this activity involves non-delegable duties. It bargained with ICA and entered into a contract that included indemnity provisions and extensive insurance coverage. DOT is essentially the only landowner that must address these risks and it has already paid to have protection for the risks arising from nondele-gable duties.
Second, even if DOT can successfully delegate the duty of care to ICA in this instance, we question whether ICA has successfully delegated its duty of care to Titan. In this case, it appears that ICA breached its contract with DOT when it allowed Titan to perform this work. If ICA had complied with its contractual requirements, it would have given DOT notice of this subcontractor. Had ICA complied with this requirement, there is little question that DOT would and should have taken the normal steps to assure that the insurance for which it had already paid would either cover the subcontractor or that additional insurance would be obtained. ICA clearly has not satisfied its burden at summary judgment to establish that it fully and successfully delegated its responsibilities for these risks to Titan under these circumstances.
Accordingly, we reverse the summary final judgment on appeal and remand for further proceedings consistent with this opinion.
KELLY, J., and LEVY, DAVID L, Associate Senior Judge, Concur.

. It appears from the record that Mr. Gilchrist took photographs of the scene that he attached to his report. None of his photographs are in the record.

. The record contains a guide to roadside mowing prepared by the DOT and a DOT loss prevention manual.

. As described earlier, ICA is contractually obligated to insure and defend DOT. This joint representation is a direct result of that contract. Given that DOT required ICA to procure insurance to cover claims like this claim, one can reasonably question what position DOT would itself take if it had independent representation in this case.

. See Fla. Std. Jury Instr. (Civ.) 401.14(c).

. Although we do not rely on the reasoning of cases involving a landowner’s nondelegable duty to maintain its property, it is worth considering that this accident arises out of such maintenance activities. See Armiger v. Associated Outdoor Clubs, Inc., 48 So.3d 864 (Fla. 2d DCA 2010); U.S. Sec. Servs. Corp. v. Ramada Inn, Inc., 665 So.2d 268 (Fla. 3d DCA 1995).

. A nondelegable duty is not a type of vicarious liability. This distinction is well explained in Armiger v. Associated Outdoor Clubs, Inc., 48 So.3d 864, 874-75 (Fla. 2d DCA2010).